1

2

3

4

5

6

7

8                         UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   RUBY CHACKO,                              No.  2:19-cv-01837-DAD-DB

12                   Plaintiff,

13        v.                                   ORDER GRANTING PLAINTIFF'S MOTION
                                               FOR SUMMARY JUDGMENT AND
14   AT&T UMBRELLA BENEFIT PLAN                DENYING DEFENDANT'S CROSS-
     NO. 3,                                     MOTION FOR SUMMARY JUDGMENT
15
                     Defendant.                (Doc. Nos. 110, 111)
16

17        This matter is before the court on the motion for summary judgment filed by plaintiff on

18   December 7, 2021 and the cross-motion for summary judgment filed by defendant on January 4,

19   2022.  (Doc. Nos. 110, 111.)  The pending motions were taken under submission by the

20   previously-assigned district judge on April 15, 2022.[1]  (Doc. No. 120.)  For the reasons explained

21   below, plaintiff's motion for summary judgment will be granted, and defendant's motion for

22   summary judgment will be denied.

23                                      **BACKGROUND**

24        Plaintiff Ruby Chacko brought this action against defendant AT&T Umbrella Benefit Plan

25   No. 3 ("defendant" or "the Plan") pursuant to the Employment Retirement Income Security Act

26   _____

27   [1]  On August 25, 2022, this case was reassigned to the undersigned.  (Doc. No. 122.)  The
     undersigned has endeavored to work through a backlog of inherited submitted motions in civil
28   cases as quickly as possible since returning to the Sacramento courthouse one year ago.

                                             1

of 1974 ("ERISA") based on defendant's denial of plaintiff's claim for long-term disability benefits.  (Doc. No. 1.)

**A.      Factual Background[2]**

          1.      The Plan's Disability Claims Process

          Plaintiff began working for AT&T Services, Inc. ("AT&T") in 1997.  (PUF ¶ 1; DUF ¶ 1.) In connection with plaintiff's employment with AT&T, plaintiff was a participant in the self-funded AT&T Disability Income Program ("the Disability Program"), which is a component program of the Plan.  (DUF ¶ 3.)  The Plan delegates its administrative authority over the Disability Program to AT&T (the "Plan Administrator").  (DUF ¶ 4.)  The Plan Administrator delegates its authority to determine benefits claims and appeals under the Disability Program to Sedgwick Claims Management Services, Inc. ("Sedgwick" or "Claims Administrator"), the third-party claims administrator who administers the claims and appeals processes under the Plan.  (*Id.*) The Claims Administrator has the sole discretion to administer the Plan including, but not limited to, determining whether a particular employee who has filed a claim for benefits is entitled to benefits under the Plan, determining whether a claim was properly decided, and interpreting the terms and provisions of the Plan.  (DUF ¶ 5.)  The Claims Administrator's determinations and interpretations are final and conclusive.  (*Id.*)  The team of Sedgwick employees who handle claims for disability benefits under the Plan is known as the "AT&T Integrated Disability Service Center" ("IDSC").  (*Id.*)

          Defendant's Disability Program provides long-term disability ("LTD") benefits to Plan participants who are determined to be totally disabled by the Claims Administrator. (DUF ¶ 6.) Under the Plan, a participant is considered "totally disabled" for purposes of receiving LTD benefits when the participant has "an Illness or Injury that prevents [her] from engaging in any employment for which [she is] qualified or may reasonably become qualified based on education,

---

[2]  This factual background is undisputed, except where otherwise noted, and is derived from the undisputed facts as stated by plaintiff and responded to by defendant (Doc. No. 111-3 ("PUF")) and the undisputed facts as stated by defendant and responded to by plaintiff (Doc. No. 115-2 ("DUF")), as well as the administrative record that was lodged electronically with the court (Doc. No. 105 ("AR")).

training, or experience." (*Id.*)  In particular, a Plan participant is "considered Totally Disabled for a long-term disability if [she is] incapable of performing the requirements of a job other than one for which the rate of pay is less than 50 percent of [her] Pay (prior to any Offsets) at the time [her] long-term disability started."[3] (*Id.*)

A Plan participant's LTD benefits end when the first of the following events occur:  (1) the participant returns to work with any of the AT&T group of companies; or (2) the participant is no longer considered disabled under the terms of the Plan.  (DUF ¶ 7.)  Only the Claims Administrator has the discretion to determine whether a participant has a qualifying disability.  (DUF ¶ 8.)  Under the terms of the Plan, a claimant must support her disability claim with

> [o]bjective medical information sufficient to show that the Participant is Disabled, as determined at the sole discretion of the Claims Administrator.  Objective medical information includes, but is not limited to, results from diagnostic tools and examinations performed in accordance with the generally accepted principles of the health care profession.  In general, a diagnosis that is based largely or entirely on self-reported symptoms will not be considered sufficient to support a finding of Disability.  For example, reports of intense pain, standing alone, will be unlikely to support a finding of Disability, but reports of intense pain associated with an observable medical condition that typically produces intense pain could be sufficient.

(DUF ¶ 9.)

The Plan further provides that appeals of denied disability claims are reviewed by IDSC's Quality Review Unit ("QRU"), as administered by Sedgwick.  (DUF ¶ 10; Doc. Nos. 105-6 at 21 (AR 180); 105-18 at 3 (AR 462)).  The Plan Administrator has delegated to the QRU the authority to determine whether the IDSC properly decided a claim.  (*Id.*)  An appeal of a denied claim is decided using the same information that was before the IDSC in making the initial denial decision, plus the issues and comments submitted by the participant employee and other evidence the QRU may independently discover.  (*Id.*; Doc. No. 105-25 at 45–46 (AR 641–42)).  The appeal

---

[3]  The Plan also provides for short term disability ("STD") benefits.  (PUF ¶ 14.)  To qualify for STD benefits, a claimant must be Totally or Partially Disabled.  (*Id.*)  Total Disability means "you are unable to perform all of the essential functions of your job or another available job assigned by your Participating Company with the same full-time or part-time classification for which you are qualified." (*Id.*)  STD benefits are payable after a 7-day waiting period for a total of 26 weeks of available benefits.  (*Id.*)

is assigned to a qualified individual or committee who was not involved in the denial of the claim. (DUF ¶ 11.)  Pursuant to the terms of the Plan, in the review of the appeal, no deference is given to the denied eligibility claim.  (DUF ¶ 12; Doc. No. 105-25 at 42 (AR 638)).  The Plan provides that the "Claims Administrator may consult with, or seek the participation of, medical experts as part of the appeal resolution process."  (Doc. No. 105-25 at 45 (AR 641)).

### 2.   Plaintiff's Disability Claims under the Plan

#### a.   *Plaintiff's Medical Condition and Claim for STD Benefits*

Plaintiff received her master's degree in information systems in April 1997 and began working for AT&T on October 28, 1997 as a professional system engineer, also referred to as a software engineer.  (PUF ¶ 1; DUF ¶ 1.)  The responsibilities of the professional system engineer position required that plaintiff "participate in and help shape the development of business requirements and develop complex functional designs based on these requirements."  (PUF ¶ 2.)  The position also involved "keyboarding and mousing 99% of the time" and was a sedentary job, which means that it involved sitting at a computer most of the time and may involve walking or standing for brief periods of time.[4]  (PUF ¶ 3; DUF ¶ 2.)

After approximately twenty years in this position, on October 29, 2017, plaintiff began experiencing severe pain/ache in her eyes, neck, shoulders, and both arms, as well as blurred vision which continued for a few weeks.  (PUF ¶ 5; DUF ¶ 13.)  That same day, Dr. Ronald T. Whitmore documented that plaintiff's head was very tender to palpation over both temporal areas and parietal scalp and both forearms were tender to palpation.  (PUF ¶ 7.)  The following day, October 30, 2017, was plaintiff's first day absent from work.  (DUF ¶ 13.)  Shortly thereafter, Sedgwick approved plaintiff's claim for STD benefits under the Plan, and plaintiff continued to receive STD benefits until the 26-week period expired on May 6, 2018.  (DUF ¶¶ 13–15.)

---

[4]  The parties dispute whether the position of professional system engineer had "physical requirements."  (PUF ¶ 3, DUF ¶ 2.)  Plaintiff characterizes "sitting, typing, and mousing" as physical requirements, whereas defendant does not.  Defendant instead appears to focus on the lack of physical *exertion* requirements in the job description (such as using force to lift, carry, and move objects) to support its assertion that plaintiff's job did not have any physical requirements. Notwithstanding the parties' competing characterizations, there is no dispute that plaintiff's job involved sitting most of the time and "keyboarding and mousing 99% of the time."  (*Id.*)

During the time that plaintiff was receiving STD benefits, she saw several physicians who noted plaintiff's complaints of pain, and those medical records show that plaintiff reported several significant symptoms to her treating providers, including shoulder and arm pain, headaches, tingling in her hands and upper arms, and swelling.  (PUF ¶ 6; DUF ¶ 16.)  On November 7, 2017, Dr. Frank Hung noted on a physical exam that plaintiff had mild give away weakness in the thumbs bilaterally.  (PUF ¶ 8.)  On December 5, 2017, Dr. Whitmore observed that plaintiff's neck was diffusely tender to palpation along the right and left trapezius (with guarding), her head was very tender to palpation over both her temporal areas and parietal scalp, and her shoulder was restricted and both forearms were tender to palpation.  (PUF ¶ 9.)  That same day, Dr. Whitmore determined that plaintiff required restrictions of modified activity at work and at home through December 19, 2017.  (PUF ¶ 10.)  Also, on December 5, 2017, Dr. Anna Pinlac diagnosed plaintiff with bilateral dry eye syndrome, cervical radiculopathy, and hyperlipidemia.  (PUF ¶ 11.)

A week later, on December 12, 2017, plaintiff began seeing Dr. Wesley Kay Hashimoto, an Occupational Medicine doctor with Kaiser Permanente, who documented on that day that plaintiff was "very stiff appearing and moves slowly. Volar pain with extension and fair flexion with volar pain, generally tender to palpation."  (PUF ¶ 12.)  Dr. Hashimoto diagnosed plaintiff with overuse disorder of soft tissue, bilateral forearm, and neck muscle strain.  (*Id.*; DUF ¶ 17.)  An x-ray of plaintiff's spine taken on December 28, 2017 confirmed the diagnosis of bilateral cervical radiculopathy.  (PUF ¶ 12.)  In Dr. Hashimoto's primary treating physician's report dated December 28, 2017, he extended plaintiff's modified activity restrictions through January 18, 2018, specifically with the following limitations:  "Screen time limited to 10 minutes per hour. Keyboarding and mousing limited to 10 minutes per hour."  (PUF ¶ 12; DUF ¶ 18; Doc. No. 105-18 at 21 (AR 480)).

Plaintiff continued to be seen by several physicians in 2018, and medical records of multiple treatment visits reflect that plaintiff reported worsening pain, which was corroborated by physical exam findings, and that Dr. Hashimoto repeatedly extended plaintiff's modified activity restrictions (screen time, keyboarding, and mousing limited to 10 minutes per hour) throughout

this period.  (PUF ¶ 16; Doc. No. 105-18 at 21–24 (AR 480–483)).  On January 11, 2018, plaintiff

had an MRI taken of her cervical spine, which showed a "slight posterior bulging disc at C5-6

which is not compressing the underlying spinal cord," but was otherwise negative.  (PUF ¶ 15;

DUF ¶ 19.)  Dr. Hashimoto's physician's progress report for that same day documents his

observations based on his physical examination of plaintiff, stating:  "Objective Findings:  Very

stiff appearing and moves slowly.  Bilaterally trapezius pain.  Trapezius tender to palpation

bilateral with spasm.  Volar pain with extension and fair flexion with volar pain.  Generally,

tender to palpation."  (PUF ¶ 15.)  Two months later, on March 9, 2018, plaintiff was seen by

physical therapist David Brian Andry who assessed plaintiff and noted in his progress notes that

plaintiff "ratchets with movements during formal testing.  Some increase in range of motion but

continues to be very limited with constant poor posture."  (PUF ¶ 17.)  He also documented

"Objective Findings:  On palpation muscle tenderness, tightness in suboccipitals, paraspinals and

upper trapezius."  (*Id.*)  A few days later, on March 13, 2018, Dr. Jonathan Rutchik performed

Electromyography and Nerve Conduction Study ("EMG/NCS") tests on plaintiff, and the test

results were normal, with no electrophysiological evidence for median neuropathy at the wrist,

ulnar neuropathy at the elbow, brachial plexopathy, or cervical radiculopathy, and no evidence of

motor or sensory polyneuropathy.  (DUF ¶ 20.)  However, additional documentation from

plaintiff's healthcare providers indicated that her medical issues were not improving as the year

progressed.  On April 12, 2018, plaintiff's physical therapist noted in his progress notes that

plaintiff "requires multiple rest breaks with all exercises.  Constant forward head posture.

[Plaintiff] continues with poor strength and poor function."  (PUF ¶ 18.)  On April 30, 2018, Dr.

Hashimoto extended plaintiff's work restrictions of keyboarding and mousing limited to 10

minutes per hour, and he documented the following objective findings in his progress report:

"Very stiff appearing and moves slowly.  There is bilateral trapezius pain, trapezius tender to

palpation bilaterally with spasm.  Most pain to levators bilaterally today.  Most pain with neck

extension.  Volar pain with extension and fair flexion with volar pain."  (PUF ¶ 19.)

Meanwhile, in a letter dated March 14, 2018, the IDSC notified plaintiff that her STD

benefits were set to expire on May 6, 2018 and that she may be eligible for LTD benefits as of

May 7, 2018.  (DUF ¶ 21.)  That letter provided plaintiff with instructions and various forms to complete to apply for LTD benefits and informed plaintiff that her treating physician would need to supply medical information that supports her inability to work.  (*Id.*; Doc. No. 105-21 at 11–12 (AR 560–61)).[5]

b.    *Plaintiff's Claim for LTD Benefits*

Plaintiff applied for LTD benefits on March 22, 2018.  (PUF ¶ 21; DUF ¶ 22.).  She also applied for SSDI benefits, accepting representation by Allsup, who kept Sedgwick updated on its progress with plaintiff's SSDI claim.  (PUF ¶ 25.)

In evaluating plaintiff's LTD claim, on April 27, 2018, Krysta Cedano, a job accommodation specialist with Sedgwick, conducted a transferrable skill assessment ("TSA") to determine whether there were alternative positions for plaintiff.  (PUF ¶ 26.)  In conducting her analysis, Ms. Cedano applied plaintiff's restrictions of screen time, keyboarding, and mousing limited to 10 minutes in an hour.  (*Id.*)  Ms. Cedano concluded that "[a]lthough [plaintiff] has transferrable skills, based on her restrictions and gainful wage, no alternative occupations can be identified" because plaintiff "is very limited from typing or using the computer, which is entirely what her position is about."  (PUF ¶¶ 4, 26.)  On May 24, 2018, IDSC approved plaintiff's claim for LTD benefits and supplemental LTD ("SLTD") benefits, effective June 1, 2018,[6] based on plaintiff's having met the following definition of disability under the Plan:

/////

/////

---

[5]  In addition, that March 14, 2018 letter explained that the Plan requires claimants to file claims for social security disability insurance ("SSDI").  (Doc. No. 105-21 at 12–13 (AR 561–62)).  To assist claimants with the SSDI claims process, IDSC partnered with Allsup, Inc. ("Allsup"), an organization that provides representation for claimants in connection with their SSDI claims.  (PUF ¶¶ 22–24.)  IDSC enclosed Allsup's promotional materials with its letter, encouraged plaintiff to accept representation by Allsup, and stated that Allsup "works directly with [IDSC] staff to ensure that you receive your maximum benefit."  (PUF ¶¶ 22–24.)

[6]  Despite the letter dated March 14, 2018 from IDSC notifying plaintiff that her STD benefits were set to expire on May 6, 2018, the LTD benefits claim approval letter dated May 24, 2018 stated:  "According to our records, Short-Term Disability benefits will end on May 31, 2018.  Therefore, your Long Term Disability will commence on June 1, 2018."  (Doc. No. 105-20 at 5 (AR 524)).  Plaintiff received STD benefits through May 31, 2018.  (*See* Doc. No. 110 at 12, n.3).

> You are considered Totally Disabled for purposes of Company-Provided Long-Term Disability Benefits under this Program when you have an Illness or Injury that prevents you from engaging in any employment for which you are qualified or may reasonably become qualified based on education, training or experience.  You will be considered Totally Disabled for a long-term disability if you are incapable of performing the requirements of a job other than one for which the rate of pay is less than 50 percent of your Pay (prior to any Offsets) at the time your long-term disability started.

(PUF ¶¶ 20, 27; DUF ¶ 23.)  The approval letter states that "[IDSC] will continue monitoring your medical condition with periodic updates to determine your continued eligibility to receive disability benefits."  (DUF ¶ 23.)  That letter further states that "[i]n the future if your condition improves, or you are no longer eligible to receive Worker's Compensation Act benefits, please contact the disability center to discuss your claim."  (Doc. No. 105-20 at 5 (AR 524)).

A physician progress report from Dr. Hashimoto dated June 11, 2018, advised that plaintiff continued to have pain in her shoulders and upper back, as well as arm numbness and tingling.  (PUF ¶ 28.)  The doctor observed similar objective findings consistent with those that he had observed in the preceding months: "Very stiff appearing and moves slowly.  More neck pain if sitting.  Most pain to levators bilaterally today.  Most pain with neck extension.  Very tender to palpation.  Most pain to posterior shoulders infraspinatus area and very tender to palpation.  Generally, tender to palpation.  Mild degenerative changes at scaphotrapezial joint."  (*Id.*)  Both Dr. Hashimoto and plaintiff's primary care physician continued to assign restrictions of keyboarding and mousing limited to 10 minutes per hour for plaintiff.  (PUF ¶ 29.)

On July 2, 2018, Ms. Cedano completed a second TSA with regard to plaintiff's LTD disability claim, which included a review of plaintiff's chart notes and medical records.  (PUF ¶ 30; Doc. No. 105-19 at 18–20 (AR 507–09)).  Again, Ms. Cedano could not identify any occupations for plaintiff based on her restrictions of keyboarding and mousing limited to 10 minutes per hour.  (*Id.*)  Ms. Cedano noted that "no alternative occupations were identified as [plaintiff] is still extremely restricted from even performing sedentary duty."  (Doc. No. 105-19 at 18 (AR 507)).

On July 20, 2018, in connection with her workers' compensation claim, plaintiff underwent a qualified medical examination ("QME") conducted by Dr. Donald T. Lee.  (PUF

¶ 31; DUF ¶ 24.)  Dr. Lee stated in his QME report that a review of plaintiff's medical records showed no history of specific or acute injury.  (DUF ¶ 26.)  Dr. Lee noted plaintiff's job as a software engineer required significant typing and the need "to frequently grip, grasp, or handle with left, right, and/or both hands."  (PUF ¶ 31.)  In the Work Restrictions section of his July 20, 2018 QME report, Dr. Lee incorrectly stated that "[t]he patient has returned to work full duty work without restrictions and thus no formal work restrictions are required."  (Doc. No. 105-19 at 3 (AR 492)).  In response to plaintiff's request for factual correction, Dr. Lee provided a supplemental report dated August 13, 2018, in which he admitted his error in this regard and provided the following corrected opinion:

> The patient has permanent restrictions and limitations with residual functionality of the following:
>
> The patient can work 8 hours per day, five days per week.
>
> The patient can alternate between sitting, standing, or walking for 1 hour at a time, with a five-minute break for a total of 8 hours per 8/hour day.
>
> The patient can lift or carry 10 lb. frequently, lift or carry 11–20 lb. occasionally, and push or pull max of 20 lb. occasionally.
>
> The patient can reach overhead occasionally, reach at desk level and below waist frequently.
>
> The patient can perform fine manipulation right/left, simple grasp right/left, firm grasp right/left occasionally.
>
> [T]he patient has ability with climbing regular stairs/regular ladders, balancing, stooping, kneeling, crouching, and crawling frequently.
>
> The patient has ability with seeing or hearing constantly and use lower extremities for foot controls occasionally.

(PUF ¶ 32; DUF ¶ 2; Doc. No. 105-17 at 16–17 (AR 445–46)).  The term "occasionally," when used for the purposes of determining work ability, means that an activity can be performed in the range of 5–33% of the workday.  (PUF ¶ 33.)

On July 25, 2018, plaintiff saw her primary care physician Dr. Adel Agaiby, and the next day, plaintiff provided Sedgwick with a copy of Dr. Agaiby's work status report from that visit in

/////

1    which Dr. Agaiby continued to restrict plaintiff to "[k]eyboarding and mousing limited to 10

2    minutes per hour."  (DUF ¶¶ 27–28; Doc. No. 105-19 at 12 (AR 501)).

3         On August 17, 2018, plaintiff faxed a copy of Dr. Lee's QME report to IDSC.  (Doc. No.

4    105-3 at 21 (AR 95)).  After receiving that report, on August 21, 2018, Sedgwick referred

5    plaintiff's claim to Ms. Cedano for a third TSA.  (Doc. No. 105-3 at 23 (AR 97)).  That same day,

6    the IDSC sent plaintiff a letter notifying her that a recent review of her LTD claim showed that

7    she may have some work capacity and the IDSC would immediately begin a vocational review to

8    determine whether or not plaintiff continued to meet the definition of disability under the terms of

9    the Plan.  (DUF ¶ 29.)

10        On August 27, 2018, Ms. Cedano conducted the third TSA, purportedly based on a review

11   of plaintiff's chart notes and medical records (as with the prior two TSAs).  (PUF ¶ 34, DUF

12   ¶ 30.)  But this time, Ms. Cedano was instructed by Sedgwick to apply only the restrictions listed

13   in Dr. Lee's QME report—not the keyboarding and mousing restriction that plaintiff's treating

14   physicians had repeatedly and continuously imposed in light of her condition and which Dr.

15   Agaiby's then-most-recent work status report had included based on his visit with plaintiff on

16   July 25, 2018.  (*Id.*; Doc. No. 105-18 at 10 (AR 469)).  Though Ms. Cedano was unable to

17   identify any occupations that plaintiff could perform previously, in this third TSA, Ms. Cedano

18   identified two alternative occupations:  systems analyst and systems engineer.  (PUF ¶ 34; DUF

19   ¶ 31.)  Ms. Cedano noted that these two positions are rated at the sedentary level of physical

20   demand.  (DUF ¶ 31; Doc. No. 105-11 at 2 (AR 251)).  However, Ms. Cedano did not provide

21   any analysis or explanation in the third TSA as to how plaintiff could perform these computer-

22   based jobs while even taking into account Dr. Lee's restrictions as stated in his QME report that

23   plaintiff could only perform "fine manipulation right/left, simple grasp right/left, firm grasp

24   right/left"—e.g., using a computer mouse and keyboard—*occasionally* (i.e., 5–33% of the

25   workday).  (Doc. Nos. 105-10 at 8 (AR 250); 105-11 at 2–3 (AR 251–52)).

26        On September 12, 2018, after approximately three and half months of plaintiff receiving

27   her LTD benefits, the IDSC sent plaintiff a letter notifying her that her LTD benefits were being

28   terminated as of September 16, 2018.  (PUF ¶ 35; Doc. No. 105-17 at 29–30 (AR 458–459)).  In

that letter, the IDSC explained that after reviewing plaintiff's LTD claim, it had been determined

that she no longer qualified for LTD benefits under the terms of the Plan.[7]  (DUF ¶ 32.)

Specifically, the letter stated the following:

> You initially ceased working your job as a Professional System Engineer due to stiff neck, pain to the shoulders and upper arms, and pain to the wrists and forearms.  You also reported blurred vision and dry eyes and headache while working on the computer.  You were treated by Dr. Wesley Hashimoto who placed you on modified activity at work[] and approved you to commence physical therapy.  Dr. Hashimoto placed you on modified activity at work with the following restrictions:  Screen time limited to 10 minutes per hour.  Keyboarding and mousing limited to ten minutes per hour.

> Our determination to deny benefits is based on a review of medical documentation provided by Dr. Hashimoto received on July 25, 2018 and information received from Dr. Donald Lee consisting of examination results provided by you on August 17, 2018.

> Dr. Hashimoto saw you on July 25, 2018 and recommended continuation of your modified work activity from August 4, 2018 through September 2, 2018.  Dr. Hashimoto stated you would be able to work at full capacity on September 3, 2018.[8]

> On August 17, 2018, you provided us with results of a comprehensive physical examination you underwent with Dr. Donald Lee on July 20, 2018.  Dr. Lee concluded that your restrictions and limitations and functional capacity for work are as follows:  The patient can work eight hours per day, five days per week.  The patient can alternate between sitting, standing, or walking for one hour at a time, with a five, minute break for a total of eight hours per day in an eight hour day.  She can lift or carry ten pounds frequently, or carry eleven to twenty pounds occasionally, and push or pull max of twenty pounds occasionally.  She can perform fine manipulation right/left simple grasp right/left firm grasp right/left occasionally.

> Based on your training, education and experience and restrictions and limitations, a Transferable Skills Analysis was completed by a Certified Rehabilitation Consultant.  The analysis identified gainful

---

[7]  Despite the IDSC's determination, two months later, on November 16, 2018, the IDSC sent a notice to plaintiff's supervisor, to advise him that plaintiff's leave of absence was approved to run from June 1, 2018, through November 30, 2018 because, "[t]he IDSC has determined that this employee is unable to return to his/her own job at this time."  (PUF ¶ 38.)

[8]  The denial letter states that Dr. Hashimoto saw plaintiff on July 25, 2018, but the records reflect that it was Dr. Agaiby who saw plaintiff on that day and who provided the work status report that stated the following restriction:  "Keyboarding and mousing limited to 10 minutes per hour."  (Doc. No. 105-19 at 12 (AR 501)).

alternate occupations in your geographical area which you are vocationally qualified to perform. These occupations included a Systems Analyst and a Systems Engineer.

These occupations fall within the sedentary level of exertion. . . .

Clinical information does not document a severity of your condition(s) that supports your inability to perform any occupation as of September 16, 2018.

For your claim to qualify for benefits, the AT&T IDSC would need clear medical evidence from your current treating provider(s) of how your medical condition limits your ability to perform the essential duties of your occupation and meets your plan's definition of disability. Your treating provider(s) would need to document your functional impairments as they relate to your diagnosis and provide a treatment plan that addresses plans for your return to work with or without reasonable restrictions with a reasonable duration. This information may be included in the following: chart or progress notes, specialist's evaluations, physical therapy notes, diagnostic test results, operative report (s), or any other clear observable medical information you feel supports your inability to perform your job duties with or without reasonable restrictions.

(Doc. No. 105-17 at 29–30 (AR 458–459); DUF ¶¶ 33–36.) The letter also explained the process for plaintiff to appeal the denial of her claim, stating that "[w]hen requesting the review of the claim denial, please state the reason(s) you believe your claim was improperly denied. You may also submit medical or vocational information, and any facts, data, questions or comments you deem appropriate for use to give your appeal proper consideration." (DUF ¶ 37.)

> c.   *Plaintiff's Appeal of the Plan's Denial of her LTD Benefits Claim*

On September 27, 2018, plaintiff submitted her initial appeal of the Plan's denial of her claim for LTD benefits. (PUF ¶ 36; DUF ¶ 38.) Plaintiff's appeal letter provided the QRU with a history of her medical treatments and the then-current state of her disability, as well as copies of work status reports from her treating physician, the QME report by Dr. Lee, and workers' compensation documents. (*Id.*) Over the next several months, plaintiff supplemented her initial appeal with additional documents on five separate occasions. First, on October 31, 2018, plaintiff supplemented her appeal by providing the QRU with a copy of a notice that her SSDI claim was approved. (PUF ¶ 37; DUF ¶ 39.) Second, on November 19, 2018, plaintiff supplemented her appeal by providing the QRU with additional physician records, her workers' compensation disability rating, and her SSDI approval and determination letters. (PUF ¶ 39; DUF ¶ 40.)

1  Specifically, this second supplement contained: (i) a work status report dated September 18,

2  2018 in which Dr. Agaiby certified plaintiff's disability through November 1, 2018 and stated

3  "[t]he patient was evaluated and deemed able to return to work at full capacity on 11/2/2018"; (ii)

4  a September 19, 2018 record from the workers' compensation department stating that plaintiff

5  was given a permanent disability rating of 21%; and (iii) the Social Security Administration's

6  Disability Determination and Transmittal to plaintiff explaining that on reconsideration of its

7  initial denial, the prior decision was reversed, and plaintiff's disability onset was "medically

8  established." (PUF ¶¶ 40–42.) Third, on November 29, 2018, plaintiff further supplemented her

9  appeal, this time by providing the QRU with a copy of a letter from California's Employment

10  Development Department, which explained that plaintiff's claim for disability insurance had been

11  approved beginning on October 1, 2018. (PUF ¶ 43; DUF ¶ 41.) Fourth, on January 2, 2019,

12  plaintiff supplemented her appeal by sending the QRU a copy of a medical certification from

13  physician assistant Hayatullah Niazi, which he completed on December 18, 2018 in connection

14  with plaintiff's California disability insurance claim. (PUF ¶ 44.) In that medical certification,

15  PA Niazi noted a diagnosis for plaintiff of soft tissue disorder in neck and shoulders and

16  explained that plaintiff was impaired from working due to "intolerable pain and pressure on the

17  neck, shoulder and arms." (*Id.*)

18      Fifth and finally, on March 13, 2019, plaintiff submitted her last supplement to her appeal,

19  which enclosed a copy of her initial consultation and evaluation by Dr. Brian Bernhardt (of IPM

20  Medical Group) through workers' compensation, a copy of an authorization for her treatment

21  with IPM Medical Group, and a copy of Dr. Bernhardt's medical certification of disability. (PUF

22  ¶ 45; DUF ¶ 42.) Specifically, on March 7, 2019, Dr. Bernhardt had diagnosed plaintiff as

23  suffering with radiculopathy of the cervical region confirmed by an MRI, and he stated that "she

24  is unable to perform her normal job duties from 11/08/17 through 09/12/19." (PUF ¶ 45; Doc.

25  No. 105-7 at 31 (AR 220)). In his treatment note, Dr. Bernhardt documented plaintiff's consistent

26  complaints of constant pain in her neck, bilateral shoulders, and elbows, including that plaintiff

27  rated her pain without medications to be a 7 on a scale of 1 to 10, and noted that plaintiff reported

28  that she sleeps about 3 hours per day without interruption. (*Id.*) Dr. Bernhardt's general review

13

1   of plaintiff's symptoms was positive for poor energy, poor sleep, and unhappiness.  (*Id.*)  Dr.

2   Bernhardt's objective findings based on his physical exam of plaintiff showed "Neck: Cervical

3   TP identified bilat trapezius and Rhomboids muscle," but noted that he was unable to evaluate

4   plaintiff's shoulders due to the cervical pain.  (*Id.*)  He also requested approval for acupuncture

5   and a cervical epidural injection and discussed psychological counseling with plaintiff because

6   she "has severe sleep and mood disorder related to the chronic pain and loss of function."  (*Id.*)

7                i.     Dr. Grattan's Review of Plaintiff's Medical Records

8        The QRU obtained a pure paper review of plaintiff's medical records from Dr. Howard

9   Grattan, who is board certified in physical medicine and rehabilitation and pain medicine and who

10   was retained by Network Medical Review Company, Ltd. ("NMR") as an independent physician

11   advisor.  (PUF ¶ 46; DUF ¶ 45.)  Dr. Grattan did not perform a physical examination of plaintiff;

12   rather, he was asked to opine on whether plaintiff is disabled based solely on a review of

13   plaintiff's medical records.  (PUF ¶ 46.)

14        Dr. Grattan prepared an initial report dated October 23, 2018, followed by five addenda

15   issued through March 22, 2019.  (*Id.*)  Each addendum reflected each time the QRU obtained

16   additional information or records from plaintiff supplementing her appeal, as the QRU sent those

17   documents to Dr. Grattan to review and determine if they changed his opinion.  (*Id.*)  According

18   to Dr. Grattan, he attempted to contact plaintiff's treating physicians, but they did not return his

19   phone calls.  (DUF ¶ 45.)  In his initial report, Dr. Grattan stated that the available medical

20   information noted that plaintiff was diagnosed with overuse disorder of the soft tissues of the

21   bilateral forearms, hands, and shoulders, and a neck muscle strain, and that an MRI of plaintiff's

22   cervical spine revealed a bulging disk at cervical vertebra fifth and sixth level (C5-6) with no cord

23   /////

24   /////

25   /////

26   /////

27   /////

28   /////

1    compression, but that an EMG/NCS of the bilateral upper extremities was negative.[9]  (DUF

2    ¶¶ 46–48.)  Dr. Grattan opined that "[f]rom a physical medicine and rehabilitation/pain medicine

3    perspective, [plaintiff] would be functionally limited secondary to restricted range of motion of

4    the bilateral shoulders and mild sensation and motor deficits on examination.  However, she is

5    capable of performing modified work duties."  (Doc. No. 105-7 at 19 (AR 208)).

6         In his initial report, Dr. Grattan opined that plaintiff was not disabled and would have the

7    capacity to work with the following restrictions:

8         Lifting, carrying, pushing and pulling 20 pounds occasionally (5–
          33% of the time) and 10 pounds frequently (33–66% of the time).
9

          Unrestricted walking, standing, and sitting.
10

          Occasionally (5–33% of the time) twisting, bending, kneeling,
11        crouching, and squatting.

12        Climbing stairs is unrestricted.

13        No climbing ladders and no working at heights.

14        [N]o reaching overhead with the bilateral upper extremities.

15        Frequently (33–66% of the time) fingering, handling, and feeling
          with the bilateral hands.
16

17    (Id.)  In his first addendum dated November 7, 2018, Dr. Grattan reviewed plaintiff's SSDI

18    approval letter, acknowledged that plaintiff had been awarded SSDI benefits, but nonetheless

19    concluded that "the medical file does not include enough evidence to clearly indicate she would

20    be placed at risk of further injury by performing modified work duties as previously outlined,"

21    and "there are not enough clinical findings to indicate the claimant would be unable to perform

22

23    _____

      [9]  According to the rationale stated in Dr. Grattan's report, x-ray studies of plaintiff's neck and
24    bilateral hands were normal.  (DUF ¶ 47; Doc. No. 105-7 at 20 (AR 209)).  However, in
      recounting medical records from plaintiff's treating physicians elsewhere in his report, Dr.
25    Grattan acknowledged that Dr. Hashimoto's work status report dated March 9, 2018 stated:  "On
      01/29/18, an x-ray of the right wrist reveals mild degenerative changes at the scaphotrapezial
26    joint."  (Doc. No. 105-7 at 18 (AR 207)).  In addition, though not reflected in Dr. Grattan's
      summary of plaintiff's medical records, in the QME report prepared by Dr. Lee (which Dr.
27    Grattan reviewed), Dr. Lee noted an imaging report from Dr. Hashimoto dated December 28,
      2017 stating that an x-ray of plaintiff's cervical spine had an impression of bilateral cervical
28    radiculopathy.  (Doc. No. 105-18 at 21 (AR 480)).

any type of work." (Doc. No. 105-7 at 22 (AR 211)).  In his second and third addendums dated December 3, 2018 and January 16, 2019, Dr. Grattan expressed the same opinion with regard to plaintiff's work restrictions as stated in his initial report.[10]  (Doc. No. 105-7 at 25, 27 (AR 214, 216)).  Then, in his fourth addendum dated February 8, 2019, Dr. Grattan updated the restrictions based on his review of progress notes from Dr. Takhar dated January 28, 2019, explaining that "[t]he most recent examination by Dr. Takhar reveals the claimant to have significantly limited motion of the bilateral shoulders with no internal and external rotation secondary to pain, as well as ongoing findings of weakness and numbness in the upper extremities." (Doc. No. 105-7 at 29 (AR 218)).  Specifically, Dr. Grattan updated the first work restriction by reducing the pounds limits:  "Lifting, carrying, pushing and pulling *10 pounds* occasionally (5–33% of the time) and *5 pounds* frequently (33–66% of the time)." (*Id.*) (emphasis added).  However, Dr. Grattan did not modify/update the restriction of "[f]requently (33–66% of the time) fingering, handling, and feeling with the bilateral hands" even though he noted that Dr. Takhar had stated that plaintiff "reports numbness and decreased sensation in the bilateral inner arms and third, fourth, and fifth digits," and that "[o]n physical examination [plaintiff] has decreased sensation to the medial aspect of the ulnar surface radiating down to the dorsal aspect of the third, fourth, and fifth fingers with equal but decreased grip strength of 4/5 bilaterally." (Doc. No. 105-7 at 28–29 (AR 217–

/////

/////

/////

---

[10]  In his December 3, 2018 addendum, Dr. Grattan noted that Dr. Hashimoto had released plaintiff back to regular work duty, while Dr. Agaiby placed plaintiff off work until November 2, 2018, at which time Dr. Agaiby found she would be able to return to regular work.  (DUF ¶ 50.)  However, according to plaintiff, this statement is inaccurate because Dr. Hashimoto released her from his care and directed that she "[c]ontinue modified duty on a non industrial basis and [] continue treatment by her personal physician," and her doctors continued to extend the end dates of her disability and work restrictions that were stated in work status reports.  (*Id.*; Doc. No. 105-19 at 27 (AR 516)).  In his January 16, 2019 addendum, Dr. Grattan noted that physician assistant Niazi stated that when he saw plaintiff on December 18, 2018, she had intolerable neck, shoulder, and arm pain, but, according to Dr. Grattan, there were no new clinical findings such as motor weakness, significantly limited motion, significantly altered sensation, or musculoskeletal abnormalities to support an inability to perform work within the restrictions and limitations he had outlined.  (DUF ¶ 51.)

1    18)).[11]  In his last addendum report dated March 22, 2019, Dr. Grattan stated that his previous

2    determination was unchanged by his review of Dr. Bernhardt's progress notes dated March 7,

3    2019, which reflected a worsening of plaintiff's symptoms and that plaintiff was unable to elevate

4    the bilateral shoulders due to neck pain.  (DUF ¶ 52; Doc. No. 105-7 at 31 (AR 220)).  Yet,

5    without explanation, Dr. Grattan increased the weight restrictions for lifting/carrying that he had

6    previously reduced, opining that plaintiff could perform modified work with the restrictions of

7    "lifting and carrying up to 20 pounds occasionally and 10 pounds frequently, no reaching

8    overhead with the bilateral upper extremities, and frequently (33–66% of the time) fingering,

9    handling, and feeling with the bilateral hands."  (*Id.*)

10        Dr. Grattan also reviewed plaintiff's SSA approval notice, which indicated that plaintiff

11   was entitled to monthly SSDI benefits, but according to him his opinion that plaintiff was not

12   disabled remained unchanged because that documentation (a SSDI claim approval notice) did not

13   include any updated comprehensive physical examinations by the attending physician or updated

14   diagnostic studies.  (DUF ¶ 53.)[12]

15        Based on his review, Dr. Grattan found that the medical information provided in

16   plaintiff's records did not indicate that her ability to function at work would be impacted—a

17   finding that plaintiff contends is not supported by the medical records.  (DUF ¶ 54.)

18                    ii.        Ms. Cedano's Fourth TSA

19        On February 12, 2019, the IDSC requested a fourth TSA from Ms. Cedano as part of their

20   review of plaintiff's appeal.  (PUF ¶ 47.)  This time, in the referral for an updated TSA, IDSC

21   instructed Ms. Cedano to apply only the restrictions that were stated in Dr. Grattan's February 8,

22   2019 addendum—"lifting, carrying, pushing, pulling no more than 10 pounds occasionally and 5

23

---

24   [11]  Dr. Grattan's report also did not explain why his opinion in this regard differed from Dr. Lee's

25   opinion that plaintiff "can perform fine manipulation right/left, simple grasp right/left, firm grasp
     right/left *occasionally*."  (Doc. No. 105-17 at 16–17 (AR 445–46)) (emphasis added).

26   [12]  Notably, however, the Plan did not seek to obtain plaintiff's underlying SSA claim file from

27   plaintiff's Allsup representative or otherwise request that plaintiff provide the QRU with her SSA
     file, which would have included the medical assessments that Dr. Grattan had noted were absent.

28   (PUF ¶ 37; DUF ¶ 53.)

pounds frequently; no lifting overhead; twisting, bending, kneeling, crouching and squatting occasionally; no climbing ladders or working at heights; no reaching overhead with bilateral upper extremities; reaching at waist level frequently; fingering, handling and feeling with bilateral hands frequently." (PUF ¶ 47; Doc. No. 105-10 at 8 (AR 250)).  Ms. Cedano did not apply any limitations by plaintiff's treating physician or Dr. Lee's restriction that plaintiff could perform fine manipulation and simple and firm grasping *occasionally*—not *frequently*, as Dr. Grattan had opined.  (*Id.*)  Ms. Cedano again identified the two alternative occupations of systems analyst and systems engineer, both of which are rated at the sedentary level of physical demand which, notably, was the same level of physical demand as her position of software engineer.  (*Id.*)

iii.      IDSC's Appeal Denial Letter

On May 13, 2019, the QRU sent plaintiff a letter stating that, after its review, the QRU decided to deny plaintiff's appeal and uphold IDSC's decision to terminate plaintiff's LTD benefits effective September 16, 2018.  (PUF ¶ 48; DUF 43; Doc. No. 105-7 at 10 (AR 199)).  In that appeal denial letter, the QRU stated that it had reviewed the medical information from The Permanente Group; Dr. Hashimoto; Dr. Lee; Dr. Susan Elizabeth Scholey; Dr. Adel Agaiby; physician assistant Niazi; and Dr. Bernhardt, as well as SSA documentation dated March 9, 2018 through March 12, 2019.  (DUF ¶ 43.)  The appeal denial letter also summarized Dr. Grattan's review notes and his reasoning for concluding that plaintiff was not disabled.  (DUF ¶ 44.)  The appeal denial letter also explained that a TSA identified two alternative positions—systems analyst and systems engineer—that plaintiff would be qualified to perform.  (DUF ¶ 55.)  IDSC further explained that while the QRU considered the SSA's disability determination and award of SSDI benefits, the QRU was making a different decision for two reasons:  (1) the SSA applies a different definition of disability than does the Plan; (2) unlike the Plan, the SSA gives special deference to the treating physician's opinion in their determination of disability under their definition.  (DUF ¶ 56.)  While the IDSC stated that it considers the treating physician's opinion in making its determination of disability, the letter explained that the IDSC also considers other factors under the Plan.  (DUF ¶ 57.)  The appeal denial letter concluded, "[a]lthough some findings are referenced, none are documented to be so severe as to prevent you from performing

18

1  the any type of work as Professional-System Engineer, with or without reasonable

2  accommodation effective September 16, 2018." (DUF ¶ 58.)

3  **B.     Procedural Background**

4           On September 13, 2019, plaintiff filed the complaint initiating this ERISA action against

5  defendant. (Doc. No. 1.) Therein, plaintiff asserted a single ERISA claim against defendant

6  pursuant to 29 U.S.C. § 1132(a)(1)(B) based on defendant's alleged failures to pay LTD benefit

7  payments to plaintiff and approve her LTD claim, to provide a prompt and reasonable explanation

8  of the basis of the Plan's denial, to adequately describe any additional information necessary for

9  plaintiff to perfect her appeal after the Plan's denial of her LTD claim, and to properly and

10  adequately investigate the merits of plaintiff's LTD claim and provide a full and fair review of

11  her claim. (*Id.* at ¶ 17.) Through this action, plaintiff seeks to recover benefits due under the

12  Plan, to enforce/clarify her rights under the Plan, and for an award of attorneys' fees and costs

13  incurred in this action pursuant to 29 U.S.C. § 1132(g)(1). (*Id.* at 2–5.)

14           Defendant answered plaintiff's complaint on November 6, 2019. (Doc. No. 9.)

15           On November 3, 2021, defendant lodged the administrative record with the court. (Doc.

16  No. 105.)

17           On December 7, 2021, plaintiff filed her pending motion seeking summary judgment in

18  her favor on her sole claim in this ERISA action and requiring defendant to pay her for past-due

19  LTD benefits from September 16, 2018 through the date of judgment, as well as continued

20  benefits under the Plan. (Doc. No. 110 at 7, 31.) In that motion, plaintiff also requests that the

21  administrative record "be expanded to include [plaintiff's] Workers' Compensation claim

22  documents which were in the Plan's possession when it decided plaintiff's claim." (*Id.* at 8.)

23           On January 4, 2022, defendant filed its pending cross-motion for summary judgment in its

24  favor, combined with its opposition to plaintiff's motion for summary judgment. (Doc. No. 111.)

25  Therein, defendant argues that "[b]ecause the Plan's denial of plaintiff's LTD benefits was

26  reasoned and based on substantial evidence, the court should deny plaintiff's claim for LTD

27  benefits and rule in favor of the Plan." (*Id.* at 32.)

28  /////

On January 18, 2022, plaintiff filed a combined opposition to defendant's motion for summary judgment and reply in support of her own motion for summary judgment.  (Doc. No. 115.)  On February 1, 2022, defendant filed its reply in support of its motion for summary judgment.  (Doc. No. 116.)[13]

## LEGAL STANDARD

"Ordinarily, summary judgment is appropriate if the pleadings and materials demonstrate there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  ERISA actions challenging a denial of benefits, however, require a slightly different analysis."  *Edwards v. AT&T Disability Income Plan*, No. 07-cv-04573-PJH, 2009 WL 650255, at *8 (N.D. Cal. Mar. 11, 2009) (citing Fed. R. Civ. P. 56(c)).

ERISA "permits a person denied benefits under an employee benefit plan to challenge that denial in federal court."  *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008).  The standard of review applied by courts in reviewing such denials depends on whether the plan at issue conferred sole discretionary authority to a plan administrator to make eligibility determinations.  *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)) (holding that a denial of benefits under ERISA "is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan").  If "the terms of the ERISA plan unambiguously grant discretion to the administrator," "then the standard of review shifts to abuse of discretion."  *Id.*

Here, the parties do not dispute that the abuse of discretion standard applies because the Plan conferred sole discretion to administer the Plan on Sedgwick, the third-party claims administrator.  (Doc. Nos. 110 at 19; 111 at 17.)  Given that the abuse of discretion standard

---

[13]  In its reply brief, defendant contends that plaintiff's 20-page combined filing (Doc. No. 115) exceeded the court's 10-page page limit for reply briefs.  (Doc. No. 116 at 4, n.1.)  The court rejects defendant's suggestion that the court should disregard any arguments made in the pages of plaintiff's filing past page 10, however, because plaintiff's filing was not solely a reply brief; it was a combined opposition to defendant's motion for summary judgment and a reply, as required by the court's order setting a briefing schedule for the cross-motions for summary judgment.  (*See* Doc. No. 93.)

applies, the parties have appropriately advanced their respective positions by way of cross-motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See Breitwieser v. Vail Corp.*, No. 2:21-cv-00568-DJC-KJN, 2023 WL 3853483, at *3 (E.D. Cal. June 5, 2023) (noting that in the ERISA context, "several district courts in this circuit have held that a Rule 56 motion is more appropriate than a bench trial under Rule 52 when the court is reviewing under an abuse of discretion standard") (citing cases); *see also Gallupe v. Sedgwick Claims Mgmt. Servs. Inc.*, 358 F. Supp. 3d 1183, 1190 (W.D. Wash. 2019) (noting that a Rule 52 motion is appropriate where review is *de novo*, not abuse of discretion). The Ninth Circuit has held that "where the abuse of discretion standard applies in an ERISA benefits denial case, 'a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply.'" *Nolan v. Heald Coll.*, 551 F.3d 1148, 1154 (9th Cir. 2009) (citation omitted). However, "when examining evidence outside of the administrative record in an ERISA case," district courts "must apply the traditional rules of summary judgment," which includes "the requirement that the evidence must be viewed in the light most favorable to the non-moving party." *Id.* at 1150.

Under the abuse of discretion standard, the court asks whether it is "left with a definite and firm conviction that a mistake has been committed." *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011) (quoting *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009)). A "plan administrator's interpretation of the plan 'will not be disturbed if reasonable.'" *Id.* at 675 (citing *Conkright v. Frommert*, 559 U.S. 506, 521 (2010)). A plan administrator abuses its discretion if its decision is "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." *Id.* at 676. Similarly, if a plan administrator "renders a decision without any explanation, construes provisions of the plan in a way that conflicts with the plain language of the plan, or fails to develop facts necessary to its determination," it also abuses its discretion. *Pac. Shores Hosp. v. United Behav. Health*, 764 F.3d 1030, 1042 (9th Cir. 2014) (citation omitted). In evaluating the plan administrator's decision, courts "weigh factors such as 'the quality and quantity of the

1    medical evidence,' whether the plan administrator relied on an in-person evaluation or conducted

2    a purely paper review of the records, and 'whether the administrator considered a contrary [Social

3    Security Administration] disability determination.'" *Gorbacheva v. Abbott Lab'ys Extended*

4    *Disability Plan*, 794 F. App'x 590, 593 (9th Cir. 2019)[14] (quoting *Montour v. Hartford Life &*

5    *Accident Ins. Co.*, 588 F.3d 623, 630 (9th Cir. 2009)).

6        "This abuse of discretion standard, however, is not the end of the story.  Instead, the

7    degree of skepticism with which we regard a plan administrator's decision when determining

8    whether the administrator abused its discretion varies based upon the extent to which the decision

9    appears to have been affected by a conflict of interest." *Stephan v. Unum Life Ins. Co. of Am.*,

10   697 F.3d 917, 929 (9th Cir. 2012).  For example, a structural conflict of interest exists where "the

11   entity that administers the plan, such as an employer or an insurance company, both determines

12   whether an employee is eligible for benefits and pays benefits out of its own pocket." *Glenn*, 554

13   U.S. at 108; *see also Montour*, 588 F.3d at 630 ("Under these circumstances, the plan

14   administrator faces a structural conflict of interest:  since it is also the insurer, benefits are paid

15   out of the administrator's own pocket, so by denying benefits, the administrator retains money for

16   itself.").  In addition, a financial conflict of interest may exist, for example, when doctors hired by

17   the plan to review the claimant's medical records have financial incentives to render opinions

18   favorable to the plan.  *See Demer v. IBM Corp. LTD Plan*, 835 F.3d 893, 901–02 (9th Cir. 2016)

19   (explaining that "the factors that raise the possibility of a financial conflict relate to the incentives

20   applicable to [the plan's] retained experts," and "[e]ven if [the plan] operated with no structural

21   conflict, reliance on the reports of its retained experts who have a financial incentive to make

22   findings favorable to [the plan] may warrant skepticism").

23       District courts must "consider the precise contours of the abuse of discretion standard in

24   every case before determining whether the applicable standard was violated." *Nolan*, 551 F.3d at

25   1154.  "[I]n general, a district court may review only the administrative record when considering

26   whether the plan administrator abused its discretion," but the "court may, in its discretion,

27   ─────────────────

28   [14]  Citation to this unpublished Ninth Circuit opinion is appropriate pursuant to Ninth Circuit Rule 36-3(b).

consider evidence outside the administrative record to decide the nature, extent, and effect on the decision-making process of any conflict of interest." *Abatie*, 458 F.3d at 970.  The party claiming the conflict has the burden to produce evidence "sufficient to warrant a degree of skepticism." *Bristol SL Holdings, Inc. v. Cigna Health Life Ins. Co.*, No. 19-cv-0709-PSG-ADS, 2022 WL 18232296, at *5 (C.D. Cal. Dec. 9, 2022) (quoting *Demer*, 835 F.3d at 902).  "[T]he precise standard in cases where the plan administrator is also burdened by a conflict of interest is only discernable by carefully considering the conflict of interest, including evidence outside of the administrative record that bears upon it." *Nolan*, 551 F.3d at 1153–54.  "[A] court is required to consider the conflict whenever it exists, and to temper the abuse of discretion standard with skepticism 'commensurate' with the conflict." *Id.* at 1153 (citing *Abatie*, 458 F.3d at 969).  "The conflict is a 'factor' in the abuse of discretion review," and "the weight of that factor depends on the severity of the conflict." *Harlick v. Blue Shield of Cal.*, 686 F.3d 699, 707 (9th Cir. 2012) (citing *Abatie*, 458 F.3d at 968).  In addition, "[a] procedural irregularity, like a conflict of interest, is a matter to be weighed in deciding whether an administrator's decision was an abuse of discretion." *Abatie*, 458 F.3d at 972.  As the Ninth Circuit explained in *Abatie*:

> A district court, when faced with all the facts and circumstances, must decide in each case how much or how little to credit the plan administrator's reason for denying insurance coverage.  An egregious conflict may weigh more heavily (that is, may cause the court to find an abuse of discretion more readily) than a minor, technical conflict might.  . . .  The level of skepticism with which a court views a conflicted administrators decision may be low if a structural conflict of interest is unaccompanied, for example, by any evidence of malice, of self-dealing, or of a parsimonious claims-granting history.  A court may weigh a conflict more heavily if, for example, the administrator provides inconsistent reasons for denial; fails adequately to investigate a claim or ask the plaintiff for necessary evidence; fails to credit a claimant's reliable evidence; or has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record.

*Abatie*, 458 F.3d at 968 (internal citations omitted).

## DISCUSSION

As a preliminary matter, the court will first address plaintiff's request that the administrative record before the court be expanded to include her workers' compensation file.

1    Then the court will address whether a conflict of interest exists such that review of the Plan's

2    decision to deny plaintiff LTD disability benefits should be "tempered with skepticism." *Abatie*,

3    458 F.3d at 959.  Once the court has determined the "precise contours of the abuse of discretion

4    standard" applicable here, *Nolan*, 551 F.3d at 1154, the court will turn to address the merits of the

5    pending cross-motions for summary judgment and the question of whether defendant abused its

6    discretion in denying plaintiff's claim for LTD benefits.

7    **A.      Whether the Administrative Record Should Include Plaintiff's Workers'
            Compensation File**
8

9            As defined in the regulations implementing ERISA, the administrative record consists of

10   all documents, records, and other information that are relevant to a claimant's claim, which means

11   that the documents, records, and other information:  (i) were "relied upon in making the benefit

12   determination;" (ii) were "submitted, considered, or generated in the course of making the benefit

13   determination, without regard to whether such document, record, or other information was relied

14   upon in making the benefit determination;" or (iii) "demonstrate[] compliance with the

15   administrative processes and safeguards" required by ERISA.  29 C.F.R. § 2560.503-1(h)(2)(iii),

16   (m)(8); *see also Montour*, 588 F.3d at 632 ("In the ERISA context, the 'administrative record'

17   consists of 'the papers the insurer had when it denied the claim.'") (quoting *Kearney v. Standard

18   Ins. Co.*, 175 F.3d 1084, 1086 (9th Cir. 1999)).

19           Plaintiff asserts that Sedgwick had her workers' compensation file in its possession when

20   it decided her LTD benefits claim and explicitly relied on certain workers' compensation related

21   evidence when it decided her claim, but Sedgwick "left out many of the medical records it had in

22   its possession" when it produced the administrative record in this case.  (Doc. No. 110 at 20.)

23   Specifically, Sedgwick did not include 147 pages of records from plaintiff's workers'

24   compensation file (bates stamped CHACKO 0072–0218), which included medical records in the

25   form of progress reports and work status reports issued by plaintiff's treating physicians—records

26   that Dr. Lee summarized and relied upon when preparing his QME report.  (*Id.* at 20–21; Doc.

27   No. 110-1 at 34–182.)  Plaintiff argues that these records constitute part of the administrative

28   record and should be added, despite defendant's failure to include them when it initially produced

1   the administrative record.  (Doc. No. 110 at 20–21.)  In support of her argument, plaintiff cites to

2   a court order in a recent case brought by a splicing technician against the same defendant Plan

3   and administrator Sedgwick, in which the district court found that the technician's entire workers'

4   compensation file—which defendant had in its possession—was part of the administrative record

5   and should not have been omitted by Sedgwick.  (Doc. No. 110 at 21) (citing *Walker v. AT&T*

6   *Benefit Plan No. 3*, 338 F.R.D. 658, 661 (C.D. Cal. 2021)).

7        In opposing plaintiff's request to expand the administrative record, defendant states that

8   the Plan included in the administrative record only the workers' compensation documents that

9   plaintiff had "submitted to the Plan as part of her appeal," and the rest of the documents were

10   "properly excluded" because plaintiff had not submitted her entire workers' compensation file

11   with her appeal.  (Doc. No. 111 at 24–25.)  Defendant also attempts to distinguish the decision in

12   *Walker* by asserting that the technician in that case "specifically submitted his workers'

13   compensation file with his appeal."  (*Id.* at 26.)  However, the joint stipulation regarding

14   discovery disagreements that defendant cites in support of this assertion does not reflect that the

15   technician had submitted his entre workers' compensation file to the Plan.  Rather, the claim

16   notes reflected that Sedgwick had reviewed the technician's workers' compensation file, which

17   Sedgwick had in its possession because it also served as the workers' compensation claims

18   administrator, and the technician had "previously authorized the use of his worker's

19   compensation medical records in his LTD claim."  (Doc. No. 115-1 at 28–29.)  Thus, this court

20   finds that defendant's attempt to distinguish the decision in *Walker* is unavailing.

21        In her reply, plaintiff emphasizes that the Plan does not deny that, similar to *Walker*,

22   Sedgwick also administered plaintiff's workers' compensation claim and had plaintiff's workers'

23   compensation file in its possession.  (Doc. No. 115 at 22.)  Plaintiff refers to pages 373 and 528 of

24   the administrative record, which consist of claim notes stating that Sedgwick is the workers'

25   compensation carrier and a workers' compensation progress report sent to Sedgwick as the

26   workers' compensation administrator.  (*Id.*)  Plaintiff also reiterates her argument that, "for

27   purposes of completeness, these records should be made part of the administrative record."  (*Id.* at

28   23.)  The court agrees.  Plaintiff's workers' compensation file, including the 147 pages that the

1  Plan excluded from the administrative record, were part of the medical records and documents

2  that Dr. Lee had reviewed and considered in preparing his QME report, which Sedgwick relied

3  upon in denying plaintiff's LTD benefits claim.  Those workers' compensation documents were

4  also in Sedgwick's possession when it decided to deny plaintiff's LTD benefits claim.

5       For these reasons, the court will grant plaintiff's request to expand the administrative

6  record to include the workers' compensation documents bates stamped CHACKO0072–0218

7  (Doc. No. 110-1 at 36–182).  *See Montour*, 588 F.3d at 632.

8  **B.     Contours of the Abuse of Discretion Standard Applicable in this Case**

9       As noted above, the parties do not dispute that the abuse of discretion standard applies, but

10  they do dispute whether a conflict of interest and/or procedural irregularities exist and the extent

11  to which the court's review should be tempered with skepticism as a result.  Plaintiff contends

12  that the court should apply the abuse of discretion standard in this case with significant skepticism

13  because:  there is a conflict of interest in Sedgwick's administration of Plan benefits; Sedgwick

14  relied on the opinions of Dr. Grattan, a biased physician reviewer with a financial conflict of

15  interest; and there were many procedural irregularities in the administration of plaintiff's LTD

16  benefits claim.  (Doc. Nos. 110 at 22–31; 115 at 11–17.)  Defendant, on the other hand, contends

17  that the Plan's decision is entitled to unfettered deference because no conflict of interest and no

18  substantial procedural irregularities exist.[15]  (Doc. No. 111 at 17–21.)  The court will address the

19  parties' respective arguments with regard to conflicts of interest and then turn to any procedural

20  irregularities.

21  _____

22  [15]  Relying on defunct case law, defendant also contends that plaintiff has failed to satisfy her
"burden to come forward with 'material, probative evidence, beyond the mere fact of an apparent

23  conflict, tending to show that the fiduciary's self-interest caused a breach of the administrator's
fiduciary obligations to the beneficiary.'"  (Doc. No. 111 at 19, 21) (quoting *Atwood v. Newmont*

24  *Gold Co.*, 45 F.3d 1317, 1323 (9th Cir. 1995)).  However, long ago in *Abatie*, the Ninth Circuit
explicitly renounced its decision in *Atwood*, finding its holding to be inconsistent with Supreme

25  Court precedent.  *Abatie*, 458 F.3d at 967 (9th Cir. 2006) ("[W]e overrule *Atwood* in its entirety
and, instead, adopt an approach that, we believe, more accurately reflects the Supreme Court's

26  instructions in *Firestone*.").  Thus, the burden that defendant contends plaintiff bears and failed to
satisfy is no longer the applicable legal standard.  *See id*. at 969 ("The careful, case-by-case

27  approach that we adopt also alleviates the unreasonable burden *Atwood* placed on ERISA

28  plaintiffs.").

1                    1.       Conflicts of Interest

2              In its cross-motion for summary judgment, defendant contends that "the Ninth Circuit and

3    this court have already determined that no conflict of interest exists between the Plan and

4    Sedgwick." (Doc. No. 111 at 17) (citing *Day v. AT&T Disability Income Plan*, 698 F.3d 1091

5    (9th Cir. 2012)).  First, defendant points to the Ninth Circuit's decision in *Day*, which held that

6    the district court had not erred in finding that no structural conflict of interest existed between the

7    defendant AT&T plan and administrator Sedgwick because "[t]he Plan is funded by AT&T and

8    not Sedgwick, and administered by Sedgwick and not AT&T."  *Day*, 698 F.3d at 1096.  Second,

9    defendant refers to several orders issued by the assigned magistrate judge and the previously-

10   assigned district judge in this case in which plaintiff's requests for structural conflict-of-interest

11   discovery were denied.  (Doc. No. 111 at 17–18 n.3) (citing Doc. Nos. 29, 37, 109).  Defendant's

12   focus in this regard is misplaced because plaintiff's argument that the court's review of the Plan's

13   decision should be tempered by skepticism is not based on an alleged *structural* conflict of

14   interest.  (Doc. No. 115 at 10) (quoting *Walker*, 338 F.R.D. at 662 (noting that "a 'structural'

15   conflict does not encompass every possible conflict of interest") (citation omitted)).  Rather,

16   plaintiff contends that two other conflicts of interest exist here:  (1) "an actual conflict of interest

17   as it relates to Sedgwick's administration of Plan benefits," and (2) a financial conflict of interest

18   surrounding Dr. Grattan, who has a demonstrated bias against claimants.  (Doc. No. 115 at 14.)

19                    a.       *Conflict in Sedgwick's Administration of Plan Benefits*

20             As to the purported actual conflict, plaintiff appears to rehash arguments that she raised

21   during the discovery phase of this litigation regarding defense counsel's conduct and

22   representations to the court; namely, the Plan's representations regarding its relationship with

23   Sedgwick (e.g., adversarial in nature, or cooperative/collaborative) and purported inability to

24   obtain responsive documents as requested by plaintiff that were in Sedgwick's possession.  (Doc.

25   No. 110 at 24.)  For example, defendant represented that it could not obtain responsive documents

26   from Sedgwick, but defendant and Sedgwick had an oral joint defense agreement in this case.

27   (*Id.*)  Defendant relied on that agreement as a reason for refusing to disclose to plaintiff its

28   communications with Sedgwick concerning its efforts to comply with discovery-related orders

1   (i.e., whether defendant's representation as to its inability to obtain responsive documents from

2   Sedgwick was accurate).  (*Id.*)  Further, in responding to plaintiff's statement of undisputed facts

3   in connection with the pending motions, defendant admits that:  "AT&T and Sedgwick

4   exchanged information and communications because the companies have a common interest in

5   the litigation and its outcome, including the financial conflict of interest issue raised by plaintiff."

6   (Doc. No. 115 at 12) (citing PUF ¶ 50).  In addition, according to plaintiff, in the *Walker* action,

7   which involved the same defense counsel representing the same defendant plan, the defendant

8   had represented to that district court that it did not have a copy of the master services agreement

9   between Sedgwick and the Network Medical Review Company, Ltd. ("NMR"), the review

10   services company that retains the independent physician reviewers that Sedgwick uses in

11   administering claims.  (Doc. No. 115 at 12.)  However, on the very same day that the defendant

12   made that representation to the court in *Walker*, defendant produced a copy of that master

13   services agreement to plaintiff in this action.  (*Id.*)  Plaintiff argues that defendant's conduct in

14   this litigation—evading discovery on the issue of conflicts and making misrepresentations to the

15   court—suffice to demonstrate an actual conflict of interest.  (*Id.*)

16        The court does not agree.  Notably, the court has already addressed and rejected plaintiff's

17   argument that "Sedgwick is not a disinterested third-party" and denied plaintiff's motion for

18   reconsideration of the court's "denial of discovery into the relationship between Defendant and

19   Sedgwick."  (*See* Doc. No. 109 at 4.)  Though plaintiff did not previously raise the specific

20   example of defendant's purported misrepresentation regarding the master services agreement

21   between Sedgwick and NMR, the court is not persuaded that an actual conflict of interests exists

22   based on defendant's conduct in this litigation and the *Walker* action.  Plaintiff focuses on

23   defendant's apparent reluctance to produce that particular agreement in discovery in the *Walker*

24   action but does not offer any evidence of the contents of that agreement nor advance any

25   arguments based on those contents that would suggest a conflict of interest.  Accordingly, the

26   court again rejects plaintiff's renewed argument that there is an "actual conflict of interest as it

27   relates to Sedgwick's administration of Plan benefits."  (Doc. No. 115 at 14.)  Moreover, plaintiff

28   has not shown that defendant had any influence over Sedgwick's claims decisions.  *See Day*, 698

F.3d at 1096 (finding that the district court did not err "in rejecting Day's allegations of actual conflict of interest," explaining that "[j]ust because Sedgwick consulted with AT&T in responding to Day's concerns about his rolled over pension benefits being received by the IRA does not show that AT&T had any influence over Sedgwick's decision making process in this regard"); *see also Edwards v. AT&T Disability Income Plan*, No. 07-cv-04573-PJH, 2009 WL 650255, at *11 (N.D. Cal. Mar. 11, 2009) (concluding that based upon the evidence provided by the defendant AT&T plan, "there is no risk of any conflict of interest in Sedgwick's administration of the claims" "[b]ecause Sedgwick has no direct economic interest in whether the claims are approved or denied").[16]

b.   *Conflict Surrounding Dr. Grattan*

As to Dr. Grattan's purported financial conflict of interest, plaintiff argues that Dr. Grattan "has exhibited significant bias towards finding a claimant capable of working," suggesting that he has financial incentives to provide reports that support a denial of disability benefits.  (Doc. Nos. 110 at 22; 115 at 14.)  Plaintiff's argument in this regard focuses not on the amount of money that NMR paid Dr. Grattan for his medical reviews (a figure that plaintiff was unable to obtain during the discovery phase of this litigation).  Rather, plaintiff focuses on the amount that NMR billed Sedgwick for the pure paper medical reviews performed by Dr. Grattan in the years 2017–2019, coupled with statistics showing that over 80% of the reports Dr. Grattan prepared for Sedgwick during those years concluded that the claimant was not disabled.  (Doc. Nos. 110 at 22–23; 115 at 14–17.)  In other words, "without evaluating a claimant in person or even speaking to them on the phone, Dr. Grattan disagrees with their treating physicians most of the time" and provided Sedgwick and NMR "with a report that will justify a denial of benefits, pleasing the plan sponsor, who in turn pays their fees."  (Doc. No. 115 at 14.)  The parties do not dispute that Dr. Grattan

/////

---

[16]  The court pauses to note that, in its reply brief, defendant states that "Sedgwick is paid a flat fee for its services regardless of claims decisions" and cites to the declaration of Charles French, which is attached as an exhibit to defendant's reply brief.  (Doc. No. 116 at 4–5.)  But the French declaration is actually silent as to how Sedgwick is paid; there is no statement whatsoever with regard to payment, let alone any indication that Sedgwick is paid by a flat fee.  (*See* Doc. No. 116-1.)

1  prepared 88 reviews in total for 61 claimants who claimed disability benefits under the Plan.[17]

2  (PUF ¶ 49.)  The parties do dispute, however, plaintiff's analysis of those reviews and the

3  statistical conclusions drawn from them.  (*Id.*)

4       In the declaration that plaintiff's counsel (attorney Michelle Roberts) submitted in support

5  of plaintiff's motion for summary judgment, attorney Roberts explains that the Plan

> produced the conclusion pages from 88 medical reviews performed
> by Dr. Howard Grattan for the Plan for the years 2017, 2018, and
> 2019 in lieu of providing specific responses to plaintiff's
> interrogatories concerning how many times Dr. Grattan opined that
> a claimant did not have functional capacity for full-time work or
> where he opined that the medical evidence did not support
> restrictions from full-time work (Interrogatory No. 19), and how
> many times Dr. Grattan opined that a claimant did not have
> functional capacity for full-time work (Interrogatory No. 18).

11  (Doc. No. 110-1 at 2 ¶ 2.)  Attorney Roberts reviewed those conclusion pages and prepared a

12  spreadsheet, which is attached as an exhibit to her declaration and contains an analysis of those 88

13  reviews, consisting of a row for each claimant, a column reflecting Dr. Grattan's conclusions, and

14  a column for notes/quotes from Dr. Grattan's reports.  (Doc. No. 110-1 at 27–32.)  Based on this

15  analysis, plaintiff asserts that of the 61 claimants for whom Dr. Grattan prepared a report, "Dr.

16  Grattan found that 50 claimants (82%) were not disabled, 8 claimants (13%) were disabled from

17  some type of work, and 3 claimants (5%) were only partially disabled or could perform some

18  work."  (Doc. No. 110 at 23.)

19       Defendant critiques plaintiff's "simplistic categorization" by pointing to four examples

20  that it believes illustrate plaintiff's "miscalculat[ion]" and by contending that "[t]he court should

21  not take plaintiff's numbers of Dr. Grattan's reviews at face value, as they clearly deserve a more

22  nuanced review than what plaintiff has provided."  (Doc. No. 111 at 24.)  Notably though,

23  defendant does not provide a nuanced review itself nor provide the court with a copy of the

24  conclusion pages ("[f]or confidentiality reasons") from which the court could conduct such a

25  review.  (*Id.* at 24 n.8.)  Thus, prior to filing her opposition to defendant's motion for summary

26  judgment, plaintiff sought and obtained the court's permission to file the conclusion pages under

27

28  _____

[17]  Dr. Grattan had prepared multiple reviews for some claimants, which is why the total number of reviews prepared by him is higher than the total number of claimants.  (PUF ¶ 49.)

1   seal so that the court would be able to review them and "determine whether plaintiff's

2   characterization was correct." (Doc. Nos. 112–14; 115 at 15.)

3        The court has undertaken a review of the conclusion pages, comparing Dr. Grattan's

4   stated conclusions with the categorization reflected in plaintiff's spreadsheet, and finds that

5   plaintiff's representations are accurate and supported by the conclusion pages themselves.

6   Indeed, nearly every claimant row in plaintiff's spreadsheet includes an accurate, verbatim quote

7   from the conclusion pages of Dr. Grattan's reports. (Doc. Nos. 110-1 at 27–32; 114-1–114-5.) In

8   addition, none of defendant's one-sentence critiques as to the four examples it highlighted have

9   any merit. For example, plaintiff categorized Dr. Grattan's conclusion as to a particular claimant

10  as partially disabled because Dr. Grattan found the claimant to be disabled for only part of the

11  relevant time period, specifically the one month following surgery, but he concluded that the

12  claimant was not disabled before that surgery or after the one-month recovery period. (Doc. No.

13  115 at 15.) Therefore, plaintiff's categorization for this claimant as partially disabled is accurate

14  and supported by the conclusion pages of the report Dr. Grattan prepared as to this particular

15  claimant. Nevertheless, defendant contends that plaintiff mischaracterized Dr. Grattan's

16  conclusions for this claimant merely because the claimant's "status continually changes." (Doc.

17  No. 111 at 23.) The court does not agree. Defendant's contention in this regard offers no

18  legitimate reason to doubt plaintiff's analysis or question the resulting statistics.

19       Similarly, defendant challenges one of plaintiff's characterizations of Dr. Grattan's

20  conclusions as "not disabled" even though Dr. Grattan was specifically asked the question, "[i]s

21  the employee disabled from performing any occupation as of 06/03/2018?" and he answered, "the

22  claimant is not disabled from performing any occupation as of 06/03/18." (Doc. Nos. 111 at 24;

23  115 at 16; 114-2 at 17.) Accordingly, the court rejects defendant's challenge to the accuracy of

24  the statistics offered by plaintiff regarding Dr. Grattan's conclusions in the medical reviews he

25  prepared for the Plan. The court now turns to the parties' arguments with regard to whether those

26  statistics tend to suggest that a conflict of interest exists here.

27       Plaintiff argues that "when the statistics show that a doctor finds an overwhelming number

28  of claimants alleging disability to be capable of work, the court can infer from this that the doctor

harbors significant bias towards finding a claimant capable of working."  (Doc. No. 23 at 32.)
Plaintiff cites to two district court decisions to support this argument—*Caplan v. CNA Financial Corp.*, 544 F. Supp. 2d 984 (N.D. Cal. 2008) and *Hertz v. v. Hartford Life & Accident Ins. Co.*, 991 F. Supp. 2d 1121 (D. Nev. 2014)—both of which defendant contends are distinguishable.

        In *Caplan*, the district court reviewed a plan's decision with skepticism because the claims administrator (Hartford Life Group Ins. Co.) relied on "apparently biased sources," which "casts serious doubt on the neutrality of its decision-making process."  544 F. Supp. 2d at 992.  The claims administrator had contracted with a third-party consortium to provide medical review services for its disability claims at a bulk discount rate, which significantly increased the consortium's revenue—indeed, nearly 75% of its revenue was derived from review services provided to the claims administrator.  *Id.* at 989–990.  The claims administrator referred the plaintiff's disability claim file to the consortium for a pure paper review, and the reviewing physician provided a report that the claims administrator relied on in denying the plaintiff's appeal.  *Id.* at 989.  The court found that this particular reviewing physician had performed chart reviews for the consortium "on a number of occasions, producing 217 evaluations for 202 Hartford claimants," of which "he found that 193 of them were capable of working full-time in some type of position under appropriate restrictions."  *Id.* at 990.  The court concluded that a conflict of interest arose from Hartford's reliance on the consortium, "a company which Hartford knows benefits financially from doing repeat business with it" and which Hartford therefore knows is incentivized to provide "reports upon which Hartford may rely in justifying its decision to deny benefits to a plan participant."  *Id.* at 991–92.  The district court also concluded that the reviewing physician "stood to benefit financially from the repeat business that might come from providing Hartford with reports that were to its liking," as evidenced by the history of the reviewing physician's conclusions, which "demonstrates that he has provided Hartford with reports that frequently support a decision to deny benefits to the claimant."  *Id.* at 992.

        In *Hertz*, the claims administrator (Hartford Life and Accident Ins. Co.) referred the plaintiff's medical file to a third-party review company called MLS, which had conducted 752 medical reviews for Hartford over a nearly three-year period.  991 F. Supp. 2d at 1129, 1136.

1    The court noted that out of a sampling of 75 of those reviews, "only four were determined to be

2    completely unable to work," and "[a]ccordingly, MLS found that approximately 95% of all

3    claimants could perform some type of work." *Id.* at 1136.  In addition, the plaintiff's medical

4    record was reviewed by a physician reviewer who had previously reviewed 14 claims for

5    Hartford during that same time period and "did not find that a single claimant was completely

6    unable to perform any type of work." *Id.*  The court found that "these statistics strongly suggest

7    that both MLS and [the reviewing physician] harbored a significant bias towards finding a

8    claimant capable of performing some type of work." *Id.*  The court concluded that "the nature of

9    Hartford's relationship with MLS and their reviewing physicians creates an incentive for MLS to

10   reach results that are favorable to Hartford in order to foster and sustain their business

11   relationship." *Id.*  The court was persuaded by "Hartford's structural conflict of interest, as well

12   as its reliance on biased vendors . . . to review Hartford's decision to terminate [the plaintiff's]

13   LTD benefits with significant skepticism." *Id.*

14        Defendant argues that *Caplan* and *Hertz* are distinguishable because in both cases,

15   Hartford operated under a structural conflict of interest, and the "over 80% of the time" figure

16   plaintiff attributes to Dr. Grattan in this case is "significantly lower than the *Caplan* and *Hertz*

17   physicians."  (Doc. No. 116 at 7, n.6 & 7) (noting that the defendant's reviewing physician in

18   *Caplan* found that claimants could work full-time nearly 96% of the time, and in *Hertz* the

19   medical review company found claimants capable of performing some type of work

20   approximately 95% of the time and the reviewing physician found claimants capable of

21   performing some type of work 100% of the time).  Defendant is correct that these facts are

22   arguably "worse" than the facts derived from the evidence presented in this case.  But that does

23   not mean that plaintiff's reliance on these cases is misplaced.

24        Plaintiff cites these cases as support for the proposition that courts can infer that a "doctor

25   harbors significant bias towards finding a claimant capable of working" when that "doctor finds

26   an overwhelming number of claimants alleging disability to be capable of work."  (Doc. No. 110

27   at 23; 115 at 14.)  That proposition remains supported, even if the percentages of those found able

28   to work in this case are less overwhelming than those in *Caplan* and *Hertz*.  Moreover, the

1    relative severity of the conflict is part of the court's consideration in determining how much

2    skepticism to apply when reviewing a plan's decision.  *See Harlick v. Blue Shield of Cal.*, 686

3    F.3d 699, 707 (9th Cir. 2012) (explaining that a conflict of interest is a factor courts consider and

4    "the weight of that factor depends on the severity of the conflict"); *see also Abatie v. Alta Health

5    & Life Ins. Co.*, 458 F.3d 955, 968 (9th Cir. 2006).  Accordingly, the court is not persuaded by

6    defendant's argument that the decisions in *Caplan* and *Hertz* are so inapposite that they provide

7    no support for plaintiff's argument.  Rather, the courts in those cases weighed the conflict factor

8    with the level of skepticism they deemed appropriate, given the severity of those conflicts, and

9    this court will do the same, as is required.

10           In the undersigned's view, the fact that Dr. Grattan found that only 8 out of 61 claimants

11   who filed disability claims under the Plan were disabled (13%) and found that 50 claimants (82%)

12   were not disabled suggests that Dr. Grattan harbored a bias in favor of the Plan and that a

13   moderate level of conflict of interest existed in the processing of plaintiff's LTD benefits claim.

14   The court acknowledges that this conflict is of a lesser degree than those presented in *Caplan* and

15   *Hertz*.  The court also recognizes that the amounts of money NMR charged Sedgwick for Dr.

16   Grattan's review of plaintiff's medical record ($1,175.00) and for all of Dr. Grattan's other

17   medical reviews for Plan claimants from 2017–2019 ($29,895.00) are relatively small amounts

18   compared to other cases in which courts have found that financial conflicts of interest existed

19   based on the compensation paid.  *See Demer v. IBM Corp. LTD Plan*, 835 F.3d 893, 902 (9th Cir.

20   2016) (finding a financial conflict of interest where the independent physician consultants earned

21   $125,000–$175,000 annually based on performing 200–300 reviews/addendums each year).  But

22   that does not negate the existence of a financial conflict of interest in this case, particularly in

23   light of the statistics suggesting Dr. Grattan has a bias against claimants and the absence of

24   contrary evidence from defendant.  *See id.* at 903 ("[T]hat Mr. Demer could have, but did not,

25   develop a stronger record of the [physician reviewer's] conflict of interest does not mean that

26   there is no conflict.").  Notably, in *Demer*, the parties did not present any evidence of the statistics

27   of the consultants' conclusions (to show a pattern of reviews unfavorable to claimants).  *Id.*  Such

28   evidence has been presented in this case.  As the Ninth Circuit in *Demer* emphasized, both the

plaintiff and the defendant "ran a risk of not developing evidence of bias or lack thereof," noting that the defendant did not offer evidence "to negate any inference of a financial conflict of interest" while the plaintiff did not "develop more powerful evidence that could have established enhanced skepticism in reviewing [the defendant's] decision." *Id.*  Thus, the court concluded that "there is neither a lack of conflict of interest (justifying no skepticism) nor a substantial conflict of interest (warranting enhanced skepticism).  Instead, the financial conflict—modest but extant—warrants some, but not substantial, weight under *Abatie* and *Montour*." *Id.*

Further, according to plaintiff, the fact that NMR charged Sedgwick on average $353 per review performed by Dr. Grattan suggests that "Dr. Grattan spent very little time analyzing claim files before rubber-stamping his opinion on them[,] which supported claim denials in most circumstances." (Doc. No. 115 at 17.)  Indeed, plaintiff cites to several decisions in which courts have criticized the quality of Dr. Grattan's medical reviews.  (Doc. No. 110 at 23) (citing cases). For example, the court in *Thoma v. Fox Long Term Disability Plan*, No. 17-cv-04389, 2018 WL 6514757 at *23–24 (S.D.N.Y. Dec. 11, 2018) identified several troubling issues with Dr. Grattan's report in that case, including that he listed and summarized the medical records he reviewed but failed to provide any actual assessment, discussion, or rationale as to why he disagreed with the opinions of the claimant's treatment providers; and he listed specific restrictions and limitations without explaining why those restrictions were supported by "objective" evidence while dismissing the restrictions recommended by treatment providers as being unsupported by objective evidence.  Similarly, in *Brainard v. Liberty Life Assurance Co. of Boston*, 173 F. Supp. 3d 482, 492 (E.D. Ky. 2016), the court criticized Dr. Grattan's report in that case as "conclusory and not well reasoned," noting that "[t]he first eleven pages of Dr. Grattan's report outline and summarize Brainard's medical records," but his "analysis of those records is hardly half a page in length."  The court also criticized Dr. Grattan for concluding, without providing any further explanation, that the claimant's "subjective complaints were inconsistent with the physical examination findings and diagnostic studies in the record." *Brainard*, 173 F. Supp. 3d at 492.  Likewise, in *Miller v. PNC Financial Services Group, Inc.*, 278 F. Supp. 3d 1333, 1344 (S.D. Fla. 2017), the court found that Dr. Grattan had "ignored plaintiff's evidence

contrary to [his] conclusions and showed no sign of substantively addressing such evidence," noting for example that "while Dr. Grattan lists Dr. Rubin's reports in the last two bullet points of the materials he reviewed, his report contains zero analysis of those reports," and he did "not explain how he derived the 90-minute restriction for continuous sitting for a total of 6 hours in an 8-hour day, or why he disagreed with Dr. Rubin's assessments—which were one-third the length (30-minute limit for continuous sitting and a total of two hours of sitting in an 8-hour day)."

Notably, in its opposition to plaintiff's motion for summary judgment, defendant does not address any of these decisions nor the criticisms of Dr. Grattan described therein—criticisms which necessarily factor into the court's analysis in this case. *See Kochenderfer v. Reliance Standard Life Ins. Co.*, No. 06-cv-620-JLS-NLS, 2009 WL 4722831, at *8 (S.D. Cal. Dec. 4, 2009) (applying a moderate level of skepticism, noting that the reviewing physician Dr. Hauptman's neutrality had been questioned in other cases in which courts "made significant and critical remarks about his impartiality," and explaining that "since Defendant was on notice of this bias issue based on prior judicial criticism, the Court finds that the use of Dr. Hauptman should also factor into its conflict of interest analysis").

In sum, the court finds that there is a conflict of interest surrounding Dr. Grattan's review of plaintiff's medical records that warrants a low-to-moderate level of skepticism. The court now turns to whether there are also procedural irregularities that provide an additional reason to review the Plan's denial of plaintiff's claim with increased skepticism.

2.    Procedural Irregularities

"Where there are 'procedural irregularities' in the claim review process, the abuse of discretion standard that is applied by the district court will be 'tempered' by heightened skepticism," and courts "must consider all the circumstances in determining how much weight to assign to a conflict or procedural irregularity." *Hoffman v. Screen Actors Guild Producers Pension Plan*, 757 F. App'x 602, 604 (9th Cir. 2019)[18] (quoting *Abatie*, 458 F.3d at 959, 971). "Where procedural irregularities are not so egregious as to warrant *de novo* review, they

---

[18] Citation to this unpublished Ninth Circuit opinion is appropriate pursuant to Ninth Circuit Rule 36-3(b).

1  nonetheless may reduce the deference afforded to the claim denial." *Cuevas v. Peace Officers*

2  *Rsch. Ass'n of Cal. Legal Def. Fund*, No. 14-cv-02540-BLF, 2016 WL 2754434, at \*5 (N.D. Cal.

3  May 12, 2016). "When an administrator can show that it has engaged in an ongoing, good faith

4  exchange of information between the administrator and the claimant, the court should give the

5  administrator's decision broad deference notwithstanding a minor irregularity." *Abatie*, 458 F.3d

6  at 972 (citation and internal quotation marks omitted).

7          Plaintiff contends that "[t]he Plan's administration of [her LTD] claim is chock-full of

8  procedural irregularities warranting increased skepticism and constituting an abuse of discretion."

9  (Doc. No. 115 at 5.) Defendant, on the other hand, argues that "the Plan followed proper

10 procedures" and "did not engage in any of the procedural irregularities that courts tend to find

11 warrant heightened skepticism," e.g., failing to provide the claimant with timely notice, failing to

12 issue a timely decision on an initial claim or appeal, and failing to reference specific Plan

13 provisions upon which the decision is based in the denial letter. (Doc. No. 116 at 5–6, n.3 & 4).

14 Plaintiff does not refute defendant's assertion as to these types of procedural irregularities, which

15 flow from violations of ERISA's notice requirements. Rather, plaintiff's argument is premised on

16 the other examples of procedural irregularities as discussed by the Ninth Circuit in *Abatie*,

17 including when "the administrator provides inconsistent reasons for denial; fails adequately to

18 investigate a claim or ask the plaintiff for necessary evidence; fails to credit a claimant's reliable

19 evidence; or has repeatedly denied benefits to deserving participants . . . by making decisions

20 against the weight of evidence in the record." *Abatie*, 458 F.3d at 968 (internal citations omitted).

21 Below, the court addresses each type of procedural irregularity asserted by plaintiff in this case.

22                      a.      *Failure to Consider the Physical Requirements of the Job*

23          First, plaintiff argues that the Plan failed "to adequately consider the physical exertion

24 requirements of [her] job, including the significant need to use a keyboard." (Doc. No. 110 at

25 25.) Plaintiff emphasizes that even Sedgwick recognized the importance of considering the job

26 requirements for her position when evaluating her claim. (*Id.*) Specifically, plaintiff points to an

27 email from Sedgwick's QRU appeal specialist to AT&T on October 3, 2018 requesting a copy of

28 the job description for plaintiff's job (professional system engineer) and explaining that "to

provide a fair and quality review of their file, their job description is needed." (*Id.*) (citing Doc. No. 105-16 at 29 (AR 427)). In addition, when evaluating plaintiff's initial claim for LTD benefits (which Sedgwick approved), a Sedgwick claims specialist emailed plaintiff's supervisor on April 26, 2018 asking for "a copy of Ms. Chacko's Job Description that includes all physical exertion requirements of her job." (Doc. No. 105-20 at 18 (AR 573)). Plaintiff's supervisor responded by stating "[t]here are no particular physical exertion requirements for this job" and providing the job description, which listed the job's technical responsibilities, the communication skills needed, and the IT/programming experience needed. (Doc. No. 105-20 at 17 (AR 536)). Plaintiff contends that this notion—that her job lacked physical exertion requirements—is contradicted by Ms. Cedano's findings in her first two TSAs that plaintiff could not work in any alternate occupation (even sedentary level positions) because plaintiff "is very limited from typing or using the computer, which is entirely what her job is about." (Doc. No. 110 at 25) (quoting Doc. No. 105-20 at 13 (AR 532)).

The court largely agrees with plaintiff in the sense that it is obvious that even a computer-based job has "physical" requirements, namely the ability to use the keyboard and mouse, even if those abilities are not physical *exertions* akin to heavy lifting, pulling, pushing, etc. Notably, defendant does not meaningfully respond to plaintiff's argument in this regard, beyond stating in conclusory fashion without any citations to the administrative record, that "the Plan did in fact consider her job's physical exertion requirements by reviewing medical reports of various physicians who saw plaintiff." (Doc. No. 111 at 20.) The denial letters in the record demonstrate otherwise. In the May 13, 2019 appeal denial letter, Sedgwick did not mention the job requirements (physical or otherwise) for plaintiff's position as a professional system engineer or the two computer-based alternative occupations of systems analyst and systems engineer that Ms. Cedano identified in the third and fourth TSAs. (*See* Doc. No. 105-7 at 10–12 (AR 199–201)). Likewise, in the September 12, 2018 claim denial letter, there is no mention of job requirements beyond a statement that those alternative occupations "fall within the sedentary level of exertion." (Doc. No. 105-17 at 29 (AR 458)). Neither denial letter addressed whether or how plaintiff could perform these computer-based jobs given the stated restrictions that Sedgwick relied upon in

1    making each determination.  The September 12, 2018 denial relied upon the restrictions as stated

2    by Dr. Lee in his QME report, including that plaintiff "can perform fine manipulation right/left

3    simple grasp right/left firm grasp occasionally," which means that plaintiff can perform this

4    activity in the range of 5–33% of the workday.  Although Dr. Lee did not use the words

5    "keyboarding" or "mousing" in stating his belief as to plaintiff's work restrictions, those activities

6    fall within this category of fine manipulation and grasping.  Thus, even Dr. Lee's restrictions

7    would limit plaintiff to performing keyboarding and mousing to between 5–33% of the workday.

8    This percentage limitation is not inconsistent with the restriction imposed by plaintiff's treating

9    physicians, which limited plaintiff to ten minutes of keyboarding and mousing per hour.  Indeed,

10   ten minutes per hour in an eight-hour workday is equivalent to 80 minutes out of 480 minutes,

11   which is 16.67%—the middle of the range offered by Dr. Lee.  Sedgwick offered no analysis or

12   explanation in its September 12, 2018 denial letter as to how plaintiff could perform her job (or

13   either of the two alternative occupations) given this keyboarding/mousing limitation.

14        Similarly, in the May 13, 2019 appeal denial letter, Sedgwick relied upon the restrictions

15   as stated by Dr. Grattan, including "frequently (33–66% of the time) fingering, handling, and

16   feeling with bilateral hands."  (Doc. No. 105-7 at 11.)  Dr. Grattan did not use the words

17   "keyboarding" or "mousing" either, though those activities would be encompassed in this

18   restriction.  In his report, Dr. Grattan did not specifically counter Dr. Lee's fine

19   manipulation/grasping restriction or explain at all why he opined that plaintiff could perform

20   those activities more frequently than Dr. Lee and plaintiff's treating physicians opined that she

21   could perform them.  In any event, in denying plaintiff's appeal, Sedgwick also did not address

22   whether or how plaintiff could perform the job requirements of the alternative occupations with a

23   limitation of performing keyboarding/mousing between 33–66% of the workday.

24        Accordingly, the court finds that the Plan did not meaningfully and adequately consider

25   the physical requirements of plaintiff's job or the identified alternative occupations, which were

26   all computer-based and obviously required using a computer with keyboarding and mousing.

27   This failure constitutes a procedural irregularity in this case particularly because the Plan defines

28   "totally disabled" as "incapable of performing the requirements of a job other than one for which

1    the rate of pay is less than 50 percent of [the claimant's] pay . . . ."  (Doc. No. 105-25 at 28 (AR

2    624)).  In other words, to determine if a claimant is disabled, the Plan by its own terms

3    necessarily requires an assessment of whether the claimant is capable of performing the job

4    requirements of their existing position and any potential alternative occupations that comport with

5    the salary limits.  The Plan's failure to do so in assessing plaintiff's claim is a procedural

6    irregularity.  *See Woolsey v. Aetna Life Ins. Co.*, 457 F. Supp. 3d 757, 774 (D. Ariz. 2020)

7    ("Aetna's failure to address the requirements of Plaintiff's specific vocation, as required by the

8    Plan's 'own occupation' provision, weighs in favor of finding a procedural irregularity here.").

9    Contrary to defendant's assertion that any procedural irregularities in its handling of plaintiff's

10   claim were "minor," the court finds this procedural irregularity to be quite significant.

11          b.      *Reliance on TSAs that Failed to Consider Keyboarding/Mousing Limit*
                    *Despite Previously Approving Plaintiff's Claim Based on that Restriction*
12

13          Relatedly, plaintiff argues that Sedgwick's reliance on the four TSAs prepared by its

14   vocational consultant, Ms. Cedano, reflects inconsistency in the Plan's reasons for denying

15   plaintiff's LTD benefits claim.  (Doc. No. 110 at 25–27.)  In asking Ms. Cedano to perform the

16   first and second TSAs, Sedgwick told her to utilize the 10 minutes per hour keyboarding/mousing

17   restrictions set forth by plaintiff's treating physicians, which she did, and in both TSAs, Ms.

18   Cedano could not identify any alternative occupations that plaintiff was able to perform.  (Doc.

19   Nos. 105-19 at 19 (AR 508); 105-20 at 14 (AR 533)).  In addition, in both of those TSAs, Ms.

20   Cedano had noted that plaintiff's job was rated at the sedentary level of demand, which "includes

21   Lifting, Carrying, Pushing, Pulling 10 Lbs. occasionally.  Mostly sitting, may involve standing or

22   walking for brief periods of time."  (*Id.*)  Even with this acknowledged sedentary level of

23   demand, Ms. Cedano nevertheless could not identify any alternative occupations.  Indeed, in the

24   email Ms. Cedano sent to transmit the second TSA to the claims analyst, she stated that plaintiff

25   "is still extremely restricted from even performing sedentary duty."  (Doc. No. 105-19 at 18 (AR

26   507)).  The Plan approved plaintiff's STD benefits claim and her initial LTD benefits claim based

27   on Ms. Cedano's first and second TSAs.  Yet, when Sedgwick asked Ms. Cedano to prepare the

28   third TSA, Sedgwick instructed her to utilize only the limitations that had been set forth in Dr.

40

1    Lee's QME report, essentially instructing her to no longer consider the keyboarding/mousing

2    restriction that plaintiff's treating physicians continued to include in their progress notes and work

3    status reports.  (Doc. No. 105-18 at 10 (AR 469)).  As noted, Dr. Lee did not mention

4    "keyboarding" or "mousing," but he did opine that plaintiff could only perform fine manipulation

5    and grasping occasionally, i.e., 5–33% of the time.  Nevertheless, without any explanation as to

6    how this restriction was materially less restrictive than the treating physicians'

7    keyboarding/mousing restriction, Ms. Cedano identified two alternative computer-based jobs that

8    plaintiff could perform.  Plaintiff emphasizes that "[i]n doing so, Ms. Cedano only focused on the

9    'sedentary' nature of these jobs but with no mention of the jobs' obvious keyboarding/mousing

10   requirements," which renders the third TSA inadequate.  (Doc. No. 110 at 26.)  In short, plaintiff

11   contends that "Sedgwick's irrational and unsupportable refusal to consider [her] primary

12   disabling restriction of limited keyboarding and mousing—especially when it was consistent with

13   Dr. Lee's proposed restriction of 'occasional' for fine manipulation—is a procedural irregularity

14   and an abuse of discretion."  (Doc. No. 110 at 27.)

15          Contrary to defendant's only counterargument—that the third TSA merely "utilized newly

16   updated and distinct medical information" (Doc. No. 116 at 11)—Sedgwick knew that plaintiff's

17   physicians continued to impose the keyboarding and mousing restriction during that time.

18   Between July 2, 2018 (the date of the second TSA) and August 21, 2018 (when Sedgwick

19   referred plaintiff's file to Ms. Cedano for a third TSA and entered Dr. Lee's QME report dated

20   July 20, 2018 in defendant's system), defendant's records continued to document plaintiff's

21   treatment providers' work status reports, which consistently imposed the ten minutes per hour

22   keyboarding and mousing restriction.  (Doc. No. 105-3 at 14–21 (AR 88–95)).  For example,

23   defendant's records reflect a work status report dated July 25, 2018—five days *after* Dr. Lee

24   performed his QME—specifically noting "[o]ther needs and/or restrictions:  Keyboarding and

25   mousing limited to 10 minutes pp hour" and that plaintiff's physician placed her on modified

26   activity from 8/4/2018 through 9/2/2018, which was an extension from the previous work status

27   report dated June 27, 2018 in which plaintiff was "placed on modified activity at work and at

28   home from 7/3/2018 through 8/3/2018" with the same restriction.  (Doc. No. 105-3 at 17–21 (AR

41

91–95)).  Despite the fact that Sedgwick had this documentation from plaintiff's treating providers in their possession, Ms. Cedano was nevertheless instructed to only apply Dr. Lee's restrictions, not the treating providers' keyboarding/mousing restriction, when preparing the third TSA on August 27, 2018.  Moreover, as noted above, the analysis in the third TSA focused on the "sedentary" level of demand of the jobs, not on whether plaintiff could perform such computer-based jobs despite the limitation that she could perform fine manipulation and simple grasping only occasionally.  Importantly, the first and second TSAs—upon which prior approvals were based—had also assessed plaintiff's position as a sedentary level of demand, but that did not enable Ms. Cedano to identify any alternative positions that plaintiff was able to perform; Ms. Cedano had determined that plaintiff could not perform even sedentary work given her restrictions.  Thus, even assuming that Dr. Lee's QME report was the most up-to-date medical information and the consideration of only his restrictions was appropriate, the third TSA remains inadequate and indicative of inconsistent reasoning on Sedgwick's part in assessing plaintiff's disability claims.  *See Kochenderfer*, 2009 WL 4722831, at *6–7 (finding "that additional skepticism of the defendant's decision is required" where the TSA "lacks any meaningful use in determining whether plaintiff is disabled" because it is conclusory, "offers a list of job titles but does not explain the tasks performed in those jobs," "provides no explanation of how plaintiff's medical restrictions would not interfere with her ability to 'perform the material duties' of the listed occupations," and "is premised on an incomplete summary of plaintiff's medical records that does not reflect her medical or practical limitations").

Thus, the court concludes that Sedgwick's reliance on the third (inadequate and incomplete) TSA as a reason for denying plaintiff's LTD benefits claim, despite previously approving her claim based on essentially the same restriction, constitutes a procedural irregularity that warrants skepticism on the court's part in reviewing the Plan's denial of plaintiff's claim.

           c.      *Reliance on Dr. Grattan's Biased and Flawed Pure Paper Reviews*

Next, plaintiff argues that Sedgwick's decision to refer plaintiff's file to Dr. Grattan for a pure paper review "raises questions about the thoroughness and accuracy of the benefits determination," and should be considered as a factor in weighing the conflict of interest.  (Doc.

42

No. 110 at 27) (quoting *Montour v. Hartford Life & Accident Ins. Co.*, 588 F.3d 623, 634 (9th Cir. 2009)). However, in *Montour*, the court explained that the plan did not require a physical exam by a non-treating physician, but the insurer's decision to only hire doctors for a pure paper review raised questions related to the conflict of interest because it was "not clear that the Plan presented [the doctors] 'with all the relevant evidence.'" *Montour*, 588 F.3d at 634 (quoting *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 123–24 (2008) (concluding "MetLife's conflict of interest influenced its decision to deny Glenn's claim for benefits" in part because MetLife failed "to provide its internal experts with all the relevant evidence of Glenn's medical condition")). Here, the administrative record does not reflect that Sedgwick engaged in any cherry-picking of which medical records to provide Dr. Grattan for his pure paper review. To the contrary, Dr. Grattan's several addendum reports reflect that the Plan provided plaintiff's supplemental submissions to Dr. Grattan for his consideration. In addition, as defendant notes in opposition to plaintiff's argument (Doc. No. 111 at 21), "ERISA [] does not require that an insurer seek independent medical examinations," *Kushner v. Lehigh Cement Co.*, 572 F. Supp. 2d 1182, 1192 (C.D. Cal. 2008). Thus, the court will consider the substantive adequacy of Dr. Grattan's pure paper review in evaluating whether Sedgwick abused its discretion, but the court does not deem Sedgwick's reliance on a pure paper review to be itself a procedural irregularity.

            d.    *Failure to Properly Consider the Social Security Administration's Decision*

Lastly, plaintiff argues that defendant inadequately considered the fact that the Social Security Administration ("SSA") deemed plaintiff to be disabled and approved her claim for social security disability insurance ("SSDI") benefits. (Doc. No. 110 at 31.) In particular, plaintiff emphasizes that the Plan only considered the SSDI determination letter; the Plan did not make any "effort to obtain [her] SSA claim file to evaluate the basis upon when her claim was granted," even though "the Plan was in regular contact with Allsup about [plaintiff's] SSDI claim and Allsup represented her in the process." (*Id.*)

Defendant counters that the appeal denial letter "explained that the Plan had reviewed the SSA's disability determination" and "decided to make a different determination" because "the SSA applies a different definition of disability that the Plan does" and "gives special deference to

1    treating physician's opinions in their determination of disability . . . ."  (Doc. No. 111 at 27.)

2    However, it has been recognized that a plan does not sufficiently "grapple" with an SSDI's

3    contrary conclusion, *Cruz-Baca v. Edison Int'l Long Term Disability Plan*, 708 F. App'x 313 (9th

4    Cir. 2017),[19] where the plan "merely pays lip service to the existence of a contrary SSA disability

5    determination" and includes "standardized language" explaining that the SSA and plan use

6    different definitions of "disability" and that unlike the SSA, private plans are not required to give

7    special deference to the opinions of the claimant's treating physicians, *Hertz v. v. Hartford Life &*

8    *Acc. Ins. Co.*, 991 F. Supp. 2d 1121, 1129, 1131, 1142 (D. Nev. 2014).  This is exactly what the

9    Plan did here.  In addition, Sedgwick stated in the appeal denial letter that Dr. Grattan had

10   reviewed the SSA approval letter, "which indicates [plaintiff was] entitled to monthly disability

11   benefits; however, the information does not include any updated comprehensive physical

12   examinations by the attending physician or updated diagnostic studies."  (Doc. No. 105-7 at 11

13   (AR 200)).  Notably, defendant does not contest plaintiff's assertion that the Plan did not request

14   plaintiff's SSA claim file (either from Allsup or plaintiff), or otherwise inform plaintiff that such

15   medical information was lacking.

16          In these circumstances, the court finds that the Plan's failure to request plaintiff's SSA

17   file, to engage in a meaningful review of the rationale underlying the SSA's approval of

18   plaintiff's SSDI benefits claim, and to explain why the Plan was reaching a different conclusion

19   constitutes a procedural violation of ERISA's regulations.  *See Walker v. AT&T Benefit Plan No.*

20   *3*, No. 2:21-cv-00916-MCS-SK, 2022 WL 1434668, at *5 (C.D. Cal. Apr. 6, 2022), *aff'd*, No. 22-

21   55450, 2023 WL 3451684 (9th Cir. May 15, 2023) (finding that the "[d]efendants violated

22   [federal regulations governing ERISA] because Sedgwick failed to inform [the claimant] that it

23   needed the entire SSDI file to properly consider the Social Security Administration's award of

24   benefits before denying the appeal"); *see also Montour*, 588 F.3d at 635 ("While ERISA plan

25   administrators are not bound by the SSA's determination, complete disregard for a contrary

26   conclusion without so much as an explanation raises questions about whether an adverse benefits

27   _____

28   [19]  Citation to this unpublished Ninth Circuit opinion is appropriate pursuant to Ninth Circuit Rule
     36-3(b).

1  determination was 'the product of a principled and deliberative reasoning process.'") (citation

2  omitted).

3        In sum, having considered these procedural irregularities, coupled with the conflict of

4  interest discussed above, the court finds it appropriate to apply a moderate level of skepticism in

5  evaluating whether there was an abuse of discretion in the denial of plaintiff's LTD benefits

6  claim.

7  **C.      Whether Sedgwick Abused its Discretion in Denying Plaintiff's LTD Claim**

8        In its cross-motion for summary judgment, defendant argues that its denial of plaintiff's

9  LTD benefits claim was not an abuse of discretion because "[p]laintiff did not meet the definition

10  of disability, nor did she provide objective medical evidence sufficient to prove her total disability

11  under the terms of the Plan." (Doc. No. 111 at 28.)  In making this argument, defendant relies on

12  the third and fourth TSAs' identification of alternative occupations, as well its opinion that

13  "plaintiff provided numerous subjective accounts of pain, but her objective medical evidence is

14  scant and fails to show any severe injury."[20]  (*Id.* at 29.)  In particular, defendant points to the fact

15  that Dr. Grattan noted the negative results of certain objective tests performed on plaintiff by her

16  treatment providers (e.g., MRI, x-ray, EMG/NCS).  (*Id.*)  Defendant also relies on Dr. Grattan's

17  conclusion that plaintiff's medical records "did not support an inability to function at work." (*Id.*

18  at 30.)

19        In moving for summary judgment in her favor, plaintiff argues that Sedgwick abused its

20  discretion in terminating her LTD benefits because she is totally disabled under the terms of the

21  Plan, and she established her disability through medical records, including treatment records that

22  "document many objective findings which corroborate her credible complaints of pain." (Doc.

23  No. 110 at 8, 21–22.)  Plaintiff stresses that she had previously been awarded STD benefits and

24  initially LTD benefits, which necessarily means that Sedgwick had found that she met the Plan's

25  /////

26  _____

27  [20]  As discussed in more detail below, *see* footnote 23, this conclusory argument advanced by
   defendant lacks support in the record.  Indeed, it is undisputed that plaintiff suffered from a
28  diagnosed medical condition and that her reported symptoms were consistent with that diagnosed
   condition.

definition of totally disabled based on the "medical evidence"[21] that she submitted to substantiate her medical conditions and the work restrictions set forth by her physicians.  (*Id.* at 8; Doc. No. 115 at 5.)  Consistent with those definitions, Sedgwick had "already determined that [plaintiff's] diagnosis was not based largely or entirely on self-reported symptoms and that her reported symptoms are associated with an observable medical condition that typically produces her reported symptoms."  (Doc. No. 115 at 6.)  Notably, when Sedgwick made those earlier determinations that plaintiff was disabled under the Plan, the results of the objective tests referenced by defendant were already part of her medical record.  (*Id.*)  For example, the MRI was performed on January 11, 2018 and the EMG/NCS test was performed on March 13, 2018— before plaintiff applied for LTD benefits on March 22, 2018 and before the Plan initially approved her LTD benefits claim on May 24, 2018.  (*Id.*)  Defendant's subsequent reliance on those "normal" test results as a reason to find that plaintiff failed to provide objective medical evidence of her disability is inconsistent and illogical.  In short, plaintiff argues that "absent any showing of improvement in her condition, the Plan terminated [her] benefits in reliance on faulty and biased medical and vocational reviews which neither adequately assessed her work restrictions nor considered how these same restrictions would prevent her from being able to perform effectively at any job for which she is qualified."  (*Id.*)  For the reasons explained below, here too, the court is persuaded by plaintiff's argument.

/////

---

[21]  The Plan provides the following definition:

> Medical Evidence.  Objective medical information sufficient to show that the Participant is Disabled, as determined at the sole discretion of the Claims Administrator.  Objective medical information includes, but is not limited to, results from diagnostic tools and examinations performed in accordance with the generally accepted principles of the health care profession.  In general, a diagnosis that is based largely or entirely on self-reported symptoms will not be considered sufficient to support a finding of Disability.  For example, reports of intense pain, standing alone, will be unlikely to support a finding of Disability, but reports of intense pain associated with an observable medical condition that typically produces intense pain could be sufficient.

(Doc. No. 105-25 at 52 (AR 648)).

1.   Failure to Meaningfully Consider Job Requirements and Medical Restrictions

As discussed above, the Plan did not adequately consider plaintiff's job description when it relied on the TSAs that omitted any acknowledgement whatsoever that plaintiff's job and the alternative occupations identified therein were computer-based jobs and necessarily required the ability to perform keyboarding/mousing.  In addition, Dr. Grattan's report—upon which the Plan also relied—stated that "there are no particular physical exertion requirements" for plaintiff's position, but Dr. Grattan did not consider plaintiff's job description beyond the vague statement that her position involved "the general responsibilities of participating in and helping shape the development of business requirements and develop complex functional designs based on requirements."  (Doc. No. 105-7 at 17 (AR 206)).  Again, there was no acknowledgement that plaintiff's position was computer-based.  Moreover, neither the September 12, 2018 claim denial letter nor the May 13, 2019 appeal denial letter mentioned the job description or requirements for plaintiff's position or the two identified alternative positions.  The Plan's failure to consider plaintiff's job description, namely the requirements associated with the computer-based jobs at issue, when evaluating plaintiff's claim for LTD benefits was an abuse of discretion.  *See McMillan v. AT&T Umbrella Benefit Plan No. 1*, 746 F. App'x 697, 701 (10th Cir. 2018) (affirming the reversal of the Plan administrator's denial of STD benefits and concluding that the district court properly found that the plan's denial "was arbitrary and capricious because Sedgwick failed to adequately consider [the claimant's] ability to perform *all* of his essential job functions before denying his claim"); *see also Gallupe v. Sedgwick Claims Mgmt. Servs. Inc.*, 358 F. Supp. 3d 1183, 1194 (W.D. Wash. 2019) ("Sedgwick's failure to meaningfully consider Ms. Gallupe's job description indicates an abuse of discretion.").

The district court's decision in *Walker*, a similar case brought against the same defendant plan with the same plan administrator Sedgwick is instructive here.  In *Walker*, the claimant worked for AT&T as a splicing technician, which "involved significant amounts of physical activity, including squatting, bending over, and lifting heavy objects"; the position was not sedentary.  *Walker*, 2022 WL 1434668 *1.  Critical to that court's analysis and conclusion that the defendants "did not abuse their discretion under the plan and did not improperly deny plaintiff

benefits" was the court's finding that "the undisputed evidence indicates that [plaintiff] could work a sedentary job where he did not have to lift more than 20 pounds." *Id.* at \*6–7. Specifically, each of the six medical evaluations of that claimant, including by two of the claimant's own treating physicians, had "determined that plaintiff can perform sedentary work where he does not have to lift more than 20 pounds." *Id.* at \*6. In addition, Sedgwick had conducted TSAs "to determine whether jobs fitting plaintiff's restrictions existed" and "identified two jobs that plaintiff could perform given his medical restrictions—a repair order clerk and a utility order clerk." *Id.* at \*7. Based on that undisputed evidence before it, the court concluded that the defendant did not abuse their discretion in concluding that the claimant was not disabled under the terms of the plan. *Id.*

Here, in contrast to *Walker*, there is no such consensus among the medical evaluations as to plaintiff's restrictions, and the TSAs that Sedgwick prepared did not address whether or how plaintiff could perform the two identified computer-based jobs despite her medical restrictions. Plaintiff emphasizes that "the record does not show that any of her providers assigned restrictions or limitations compatible with full-time sedentary work that consists primarily of computer work and keyboarding/mousing." (Doc. No. 115 at 8.) Notably, plaintiff's physicians continued to impose a 10 minute per hour keyboarding/mousing restriction (i.e., 16.67% of the time), whereas Dr. Lee, who conducted a QME in connection with plaintiff's workers' compensation claim, opined that plaintiff could perform fine manipulation and simple grasping only occasionally (between 5–33% of the time). As the court has already noted above, without any explanation or analysis of these respective opinions, Dr. Grattan opined that plaintiff could perform these tasks more often, specifically stating the following restriction: "[f]requently (33–66% of the time) fingering, handling, and feeling with the bilateral hands." (Doc. No. 105-1 at 19 (AR 208)). None of these opinions supports Sedgwick's conclusion that plaintiff could perform her computer-based job, which defendant concedes required "keyboarding and mousing 99% of the time." (*See* PUF ¶ 3.) Moreover, there is no reference or discussion whatsoever as to the job requirements for the two computer-based jobs identified in the third and fourth TSAs, let alone a representation that those jobs require the employee to perform keyboarding and mousing no more

1   than 66% of the time.  Those TSAs simply do not provide a well-reasoned analysis to support the

2   conclusion that plaintiff could perform those alternative jobs merely because those jobs—like

3   plaintiff's existing position—were sedentary.  Thus, it was not reasonable for Sedgwick to rely on

4   these TSAs as a basis upon which to find that plaintiff no longer met the plan's definition of

5   disabled and to terminate plaintiff's LTD benefits.  Doing so under these circumstances

6   constituted an abuse of discretion because Sedgwick "failed to develop facts necessary to its

7   determination." *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir.

8   2011).[22]

9           2.      Denying Plaintiff LTD Benefits Based on Inaccurate and Misleading Reasons

10          Sedgwick's explanation, as provided to plaintiff in the letter terminating her LTD benefits,

11  also indicates an abuse of discretion in its processing of her claim.  In the September 12, 2018

12  claim denial letter (predicated on Dr. Lee's QME report and the third TSA), Sedgwick stated the

13  following:  "Dr. Hashimoto saw you on July 25, 2018 and recommended continuation of your

14  modified work activity from August 4, 2018 through September 2, 2018.  Dr. Hashimoto stated

15  you would be able to work at full capacity on September 3, 2018." (Doc. No. 105-17 at 29 (AR

16  458)).  However, these statements are inaccurate and misleading.

17          First, the statements are inaccurate because Dr. Hashimoto did not see plaintiff on July 25,

18  2018; plaintiff was seen by her primary care physician, Dr. Agaiby, on that date.  (Doc. No. 105-

19  19 at 12 (AR 501)).  This was made clear in plaintiff's medical records.  Even Dr. Lee's report

20  (on which Sedgwick relied) summarized plaintiff's medical records and specifically noted that:

21  "On 07/25/18, a Work Status Report signed by Adel Derias Agaiby, MD states the claimant is

22  placed on modified activity at work and at home from 08/04/18 through 09/02/18 of keyboarding

23  and mousing no greater than 10 minutes per hour.  She will be able to return to regular, full duty

24  work on 09/03/18." (Doc. No. 105-15 at 29 (AR 398)).  Thus, Sedgwick's misstatement in this

25  _____

26  [22]  The court notes that Sedgwick failed to assess or even consider the extent to which
    keyboarding and mousing was required for the alternative positions it found plaintiff to be
27  capable of performing, and thus its decision was "without support in inferences that may be
    drawn from the facts in the record."  *Pac. Shores Hosp. v. United Behav. Health*, 764 F.3d 1030,
28  1042 (9th Cir. 2014).

1    regard suggests that Sedgwick did not carefully review either plaintiff's medical records or the

2    QME report from Dr. Lee.

3           Second, the explanation is misleading because Sedgwick does not acknowledge that the

4    purported return-to-work date had repeatedly been extended.  That is, plaintiff's physicians Dr.

5    Hashimoto and Dr. Agaiby provided start and end dates (estimated future return-to-work dates) in

6    their reports, but they repeatedly extended those periods of time and end dates.  For example, Dr.

7    Agaiby's work status report from the month prior, dated June 27, 2018, had placed plaintiff "on

8    modified activity at work and at home from 7/3/2018 through 8/3/2018," again with the ten

9    minutes per hour keyboarding/mousing restriction, and that report stated that plaintiff was

10   "deemed able to return to work at full capacity on 8/4/2018."  (Doc. No. 105-19 at 22 (AR 511)).

11   Furthermore, in the work status report prior to that one, which was prepared by Dr. Hashimoto,

12   plaintiff was placed "on modified activity at work and at home from 06/11/18 through 07/02/18

13   of keyboarding and mousing no greater than 10 minutes per hour."  (Doc. No. 105-7 at 18 (AR

14   207)).  In other words, as plaintiff argues, "when one reviews the actual work status report, Dr.

15   Agaiby extended [plaintiff's] disability into the future by month which is consistent with the past

16   work status reports that extended her disability into the future," and "neither Drs. Hashimoto nor

17   Agaiby found that [plaintiff] could work at full capacity as of September 3, 2018 or any other

18   date."  (Doc. No. 115 at 7.)  Indeed, Dr. Agaiby provided another work status report dated

19   September 18, 2018 in which plaintiff was placed off work from "10/3/2018 through 11/1/2018"

20   with a return-to-work date of November 2, 2018.  (Doc. No. 105-15 at 10 (AR 379)).  When

21   viewed in this context, the Plan's stated basis for denying plaintiff's LTD benefits—that its

22   determination was "based on a review of the medical documentation provided by Dr.

23   Hashimoto"—was not reasonable.

24           3.      Reliance on Dr. Grattan's Inadequate Pure Paper Review

25           Similar to the criticisms that other courts have discussed when evaluating the adequacy of

26   Dr. Grattan's reports, his pure paper review of plaintiff's file in this case presents many of the

27   same deficiencies and reliability concerns.  Like the reports at issue in *Thoma v. Fox Long Term*

28   *Disability Plan*, No. 17-cv-04389, 2018 WL 6514757, at *23–24 (S.D.N.Y. Dec. 11, 2018) and

*Brainard v. Liberty Life Assurance Co. of Boston*, 173 F. Supp. 3d 482, 492 (E.D. Ky. 2016), Dr. Grattan merely listed and summarized the medical records that he reviewed in this case, but he did not provide any actual assessment, discussion, or rationale for why he disagreed with the opinions of Dr. Lee or plaintiff's medical providers.  Also, just like the report at issue in *Miller v. PNC Financial Services Group, Inc.*, 278 F. Supp. 3d 1333, 1344 (S.D. Fla. 2017), Dr. Grattan's report and addendums in this case did not substantively address plaintiff's medical evidence; rather, he merely listed the records in the "synopsis" of his report but did not analyze those records.  For example, in his initial report dated October 23, 2018, Dr. Grattan listed/summarized in the synopsis the following record:  "On 09/18/18, a Work Status Report signed by Adel Derias Agaiby, MD states the claimant is placed off work from 10/03/18 through 11/01/18.  She will be able to return to full duty work on 11/02/18."  (Doc. No. 105-7 at 19 (AR 208)).  Despite specifically stating that "Adel Derias Agaiby, MD placed the claimant off work through 11/02/18," Dr. Grattan nonetheless concluded that plaintiff "is not disabled from any type of work as of 09/16/18 through the present time," without any explanation as to why he disagreed with Dr. Agaiby, who had actually physically examined plaintiff.  (*Id.*)

Moreover, Dr. Grattan's December 3, 2018 addendum and January 16, 2019 addendum both provided the same exact rationale paragraph despite the fact that plaintiff had provided additional evidence, namely a medical record by physician assistant Niazi dated December 18, 2018 that was prepared in connection with plaintiff's state disability insurance claim.  (*Compare* Doc. No. 105-7 at 25 (AR 214) *with* Doc. No. 105-7 at 27 (AR 216)).  Dr. Grattan listed this record as follows:  "On 12/18/18, a Physician/Practitioner's Supplementary Certificate form signed by Hayatullah Niazi, PA-C states the claimant has intolerable pain and pressure of the neck, shoulder, and arms.  A possible return to work date is 02/28/19."  (Doc. No. 105-7 at 26 (AR 215)).  Yet Dr. Grattan did not address this record in his rationale paragraph; rather, he merely stated that this record did not alter his previous determination because "there are no new clinical findings such as motor weakness, significantly limited motion, significantly altered sensation, or musculoskeletal abnormalities to support an inability to perform work within the restrictions and limitations previously outlined."  (Doc. No. 105-7 at 27 (AR 216)).

1          Then, in his February 8, 2019 addendum, Dr. Grattan substantively considered progress

2   notes from Dr. Takhar dated January 28, 2019 and modified his restrictions only to lessen the

3   pound limits for "lifting, carrying, pushing and pulling."  (Doc. No. 105-7 at 29 (AR 218)).  Dr.

4   Grattan explained that "[t]he most recent examination by Dr. Takhar reveals the claimant to have

5   significantly limited motion of the bilateral shoulders with no internal and external rotation

6   secondary to pain, as well as ongoing findings of weakness and numbness in the upper

7   extremities."  (Doc. No. 105-7 at 29 (AR 218)).  In his rationale, Dr. Grattan focused only on Dr.

8   Takhar's clinical findings with regard to plaintiff's shoulder mobility; he did not discuss or

9   include in his rationale the fact that Dr. Takhar also made the objective finding that plaintiff "is

10  able to make a fist but hand grip is weak bilaterally.  Hand grip strength is 4/5 bilaterally."  (Doc.

11  No. 105-12 at 297 (AR 297)).  Dr. Grattan also did not mention Dr. Takhar's subjective findings

12  that plaintiff experiences "numbness and decreased sensation to bilateral inner arms and to her

13  3rd, 4th, and 5th fingers."  (Doc. No. 105-7 at 28–29 (AR 217–218)).  Dr. Grattan decided to

14  modify the pound limits for the lifting/carrying restriction based on Dr. Takhar's progress notes,

15  but he wholly ignored other aspects of Dr. Takhar's clinical findings that spoke to the "fingering,

16  handling, and feeling with the bilateral hands" restriction, which remained unchanged, without

17  providing any explanation for doing so.

18          Finally, Dr. Grattan's March 22, 2019 addendum further exemplified the inadequacy of

19  his pure paper review.  Dr. Grattan summarized Dr. Bernhardt's progress note dated March 7,

20  2019 and stated:  "On 03/12/19, a Request for Medical Information form signed by Brian

21  Bernhardt, M.D. states the claimant is diagnosed with cervical radiculopathy which was

22  confirmed by MRI.  She is unable to perform her normal job duties from 11/08/17 through

23  09/12/19."  (Doc. No. 105-7 at 31 (AR 220)).  Dr. Grattan acknowledged that Dr. Bernhardt

24  physically examined plaintiff and found that she "has tenderness over the neck and bilateral

25  trapezius and rhomboid muscles" and "was unable to elevate the bilateral shoulders due to neck

26  pain."  (*Id.*)  Despite this, Dr. Grattan inexplicably reinstated his prior restriction with regard to

27  /////

28  /////

52

1    lifting/carrying, returning the pounds limit to his original restriction: "lifting and carrying up to

2    20 pounds occasionally and 10 pounds frequently."  (*Id.*)[23]

3         In applying a moderate level of skepticism, the court finds that Sedgwick's reliance on Dr.

4    Grattan's pure paper review, in light of these inconsistencies and substantive inadequacies,

5    constitutes an abuse of discretion.  *See Gorbacheva v. Abbott Lab'ys Extended Disability Plan*,

6    794 F. App'x 590, 593 (9th Cir. 2019)[24] (noting that courts "weigh factors such as the quality and

7    quantity of the medical evidence [and] whether the plan administrator relied on an in-person

8    evaluation or conducted a purely paper review of the records") (citation and internal quotation

9    marks omitted).  Ultimately, even if these inadequacies were to be excused, the fact remains that

10   the Plan relied on Dr. Grattan's conclusions and restrictions without concurrently considering that

11   keyboarding/mousing is inherently required in the computer-based jobs it identified as alternative

12   positions.  That is, even if Dr. Grattan's report had been well-supported and his conclusions well-

13   reasoned, he nonetheless opined that plaintiff could only perform "fingering, handling, and

14   feeling with the bilateral hands" *frequently*—not 99% of the time.  Critically, Dr. Grattan

15   provided this opinion despite knowing that plaintiff's physicians had imposed specific

16   keyboarding/mousing restrictions, yet he did not simultaneously caveat his fingering/handling/

17   feeling restriction to provide that plaintiff is somehow nevertheless capable of keyboarding and

---

18   [23]  It is important to note and emphasize that the parties do not dispute that plaintiff was
19   diagnosed with  cervical radiculopathy, overuse disorder of soft tissue and bilateral forearm, and
     neck muscle strain.  (PUF ¶¶ 11, 12, 45; DUF ¶¶ 17, 46–48.)  Neither Dr. Lee nor Dr. Grattan
20   disputed these diagnoses or opined that plaintiff's reported symptoms were inconsistent with her
     diagnosed medical condition.  Notably, Dr. Lee stated in his QME report: "[I]it is my opinion that
21   the patient's symptoms are due to cumulative trauma . . . sustained in the course of employment
     as a result of doing her usual and customary work.  Her job duties require the patient to use her
22   hands repetitively using a computer, keyboard, and mouse."  (Doc. No. 105-19 at 5 (AR 494)).  In
     Dr. Grattan's report, he summarized plaintiff's diagnoses and the objective findings underlying
23   those diagnoses and concluded that "it is reasonable [that plaintiff] would be functionally
     impaired" in light of her condition, but that she could nevertheless perform modified work duties
24   with the restrictions he outlined.  (Doc. No. 105-11 at 10 (AR 259)).  In other words, plaintiff's
     diagnoses and the related symptoms are not at all called into question in the record before the
25   court.  Rather, Dr. Lee, Dr. Grattan, and her treating physicians only have different opinions as to
     the extent of her functionality and limitations as a result of her diagnosed medical condition.
26

27   [24]  Citation to this unpublished Ninth Circuit opinion is appropriate pursuant to Ninth Circuit Rule
28   36-3(b).

1    mousing nearly all of the time.  Therefore, it was unreasonable for Sedgwick to rely on Dr.

2    Grattan's opinion as support for its determination that plaintiff's medical condition was not "so

3    severe as to prevent [plaintiff] from performing the [sic] any type of work as a professional-

4    system engineer"—her computer-based job that defendant concedes requires keyboarding and

5    mousing 99% of the time.  (Doc. No. 105-7 at 11 (AR 200)).

6              4.      Failure to Meaningfully Consider SSDI Award and Distinguish Rationale

7              As discussed above, the Plan did not properly consider the SSA's approval of plaintiff's

8    SSDI benefits claim, which also indicates an abuse of discretion.  *See Cruz-Baca*, 708 F. App'x at

9    315 ("No principled reason is offered for the Plan's failure to review [the claimant's] SSDI

10   award, which is reliable evidence of her disability.  This constituted an abuse of discretion.").  Dr.

11   Grattan had stated the following in his November 7, 2018 addendum:  "[w]hile the claimant was

12   awarded Social Security benefits, from a physical medicine and rehabilitation/pain medicine

13   perspective, the medical file does not include enough evidence to clearly indicate she would be

14   placed at risk of further injury by performing modified work duties as previously outlined;" and

15   "[w]hile the claimant has been awarded Social Security benefits, there are not enough clinical

16   findings to indicate the claimant would be unable to perform any type of work."  (Doc. No. 105-7

17   at 22 (AR 211)).  These comments suggest that Sedgwick was clearly made aware of the need for

18   the medical information in plaintiff's SSDI claim file, and yet did not request that information

19   from plaintiff or her representative Allsup—information that Sedgwick knew was relevant to

20   plaintiff's claim and to the Plan's ability to distinguish its determination from the SSA's disability

21   determination.  *See Montour*, 588 F.3d at 635 (explaining that "not distinguishing the SSA's

22   contrary conclusion may indicate a failure to consider relevant evidence").

23             For all of the reasons discussed above, and after applying the appropriate moderate level

24   of skepticism, the court concludes that the Plan abused its discretion when it terminated plaintiff's

25   LTD benefits and denied her appeal.  The court is "left with a definite and firm conviction that a

26   mistake has been committed."  *Salomaa*, 642 F.3d at 676.  Accordingly, the court will grant

27   plaintiff's motion for summary judgment and deny defendant's motion for summary judgment.  It

28   is undisputed that plaintiff has been without LTD benefits since September 16, 2018.  Therefore,

judgment will be entered in plaintiff's favor for past-due LTD benefits from September 16, 2018 through the date of entry of judgment and with continued LTD benefits under the Plan.[25]  *See Barnett v. S. Cal. Edison Co. Long Term Disability Plan*, No. 1:12-cv-00130-LJO-SAB, 2016 WL 4077721, at *12 (E.D. Cal. July 5, 2016) (explaining that the remedy for "plaintiffs whose continuing benefits were terminated as the result of 'arbitrary and capricious' decisions by plan administrators" is ordering back benefits and reinstatement of benefits) (quoting *Pannebecker v. Liberty Life Assur. Co. of Bos.*, 542 F.3d 1213, 1221 (9th Cir. 2008)); *see also Bertelson v. Hartford Life Ins. Co.*, 1 F. Supp. 3d 1060, 1075 (E. D. Cal. 2014) ("Here it is undisputed that Defendant terminated Plaintiff's long-term disability benefits upon [an arbitrary and capricious] determination that she was no longer disabled.  Retroactive reinstatement of benefits is therefore the appropriate remedy."); *Kurth v. Hartford Life Ins. & Acc. Ins. Co.*, 845 F. Supp. 2d 1087, 1101-02 (C.D. Cal. 2012) ("But for Defendant's erroneous determination that Plaintiff was no longer entitled to benefits, Plaintiff would have continued receiving LTD benefits.  Accordingly, reinstatement of the LTD benefits is appropriate."); *Hoffman v. Screen Actors Guild Producers Pension Plan*, No. 16-cv-01530-CJC-EX, 2020 WL 826041, at *2 (C.D. Cal. Jan. 15, 2020) (the court's "finding that the plan abused its discretion when it terminated plaintiff's benefits in 2015 entitles her to benefits in arrears under *Pannebecker*," and thus, "she is entitled to the benefits that she would have continued to receive until Defendants give her a full and fair review of her claims").

## CONCLUSION

Accordingly:

1.      Plaintiff's request to expand the administrative record to include her workers' compensation documents bates stamped CHACKO0072–0218 is granted;

2.      Plaintiff's motion for summary judgment (Doc. No. 110) is granted;

3.      Defendant's motion for summary judgment (Doc. No. 111) is denied;

4.      Judgment shall be entered in favor of plaintiff and against defendant;

---

[25]  Notably, defendant does not contest the scope of this requested relief, nor does it propose that the court consider any alternative relief in the event that the court ruled in plaintiff's favor.

55

5.   Defendant shall pay plaintiff for past-due LTD benefits from September 16, 2018 through the date of entry of judgment, with continued LTD benefits under the Plan;

a.   The parties shall meet and confer as soon as practicable for the purpose of providing the court with an accounting to determine the amounts owed to plaintiff in a proposed amended judgment to be filed within 14 days of entry of this order;

6.   Any requests for costs or motions for attorney's fees shall be governed by Local Rules 292 and 293, respectively, including applicable deadlines; and

7.   The Clerk of the Court is directed to close the case.

IT IS SO ORDERED.

Dated:   **September 6, 2023**

DALE A. DROZD
UNITED STATES DISTRICT JUDGE